R. BARTLEY HALLORAN ET AL. *v.* SPILLANE'S SERVICENTER, INC., ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT     FILE No. 700307
OF HARTFORD

Memorandum filed June 13, 1990

*Alfano, Halloran & Flynn* and *F. Timothy McNamara,* for the plaintiffs.

*Weisman & Hillman,* for the defendants.

MALONEY, J. The named plaintiff brings this action on behalf of himself and on behalf of the entire class of persons similarly situated. The named defendant, Spillane's Servicenter, Inc., is a corporation engaged in the business of removing and towing motor vehicles that have been parked on private property without permission from the property owner. The defendant Cheryl Spillane is an employee of the defendant corporation. The defendant[1] has stipulated that all the criteria of General Statutes § 52-105 and Practice Book §§ 87 and 88 have been satisfied. The class consists of past, present and future owners of motor vehicles that have been removed and towed from private property by the

---

[1] The term "defendant" as used here means Spillane's Servicenter, Inc., acting through its employees, unless the context indicates otherwise.

defendant at the request of the property owners and subsequently retained or stored by the defendants. On the basis of all the evidence, the court finds, in accordance with Practice Book § 88, that the questions of law or fact common to the members of the class prevail over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In his complaint, the named plaintiff seeks injunctions, damages and other relief based on alleged violations of General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act (CUTPA). Prior to trial, the parties agreed, with the permission of the court, that the court would hear evidence on issues pertaining to injunctive relief and liability for damages under CUTPA and would make findings and issue appropriate orders. The parties agreed further that if the court finds that the defendants are liable for damages, the amount of these damages would be decided by a jury after a separate hearing.

The following facts are found on the basis of evidence introduced at the trial before this court and by stipulation of the parties. The defendant corporation operates its towing business in the greater Hartford area. Robert Spillane is the president and sole stockholder. He is active in all phases of the company's business, including operating tow trucks, seizing trespassing vehicles, establishing rules and practices for releasing vehicles to their owners, negotiating rates and prices for various services with the department of motor vehicles, and collecting amounts charged for towing and storage services. Cheryl Spillane is employed by the defendant corporation to work in its office. In that capacity, she collects amounts charged and otherwise implements the defendant corporation's business practices. She is the licensed operator of the towing busi-

ness but there was no evidence that she establishes policies and rules of the corporation as alleged in the complaint; accordingly, the court does not find that she performs those functions.

The defendant corporation's practice in conducting its business as it applies to towing trespassing vehicles from private property is in accord with the practice followed by other companies in the same business throughout the state. The defendant either responds to a specific request from a property owner who discovers an unauthorized vehicle on his property or acts in accordance with a contract with a property owner to monitor the property and to remove any offending vehicles. The defendant then transports the vehicle either by towing it or by carrying it on a flatbed truck to the defendant's lot, where it is placed in a protected area. The defendant then notifies the local police department that it has the vehicle in its possession. The defendant does not attempt to notify the owner or to determine who the owner is. The vehicle remains in the defendant's possession until the defendant releases it to the owner.

Prior to October, 1989, the defendant refused to release vehicles to owners except during its normal business hours of 8:30 a.m. to 4:30 p.m., Monday through Friday, holidays excluded. No exceptions to this practice were permitted. The defendant chose its own normal business hours. The defendant was not required to obtain approval of this schedule from the department of motor vehicles, but was required to obtain approval of the rates it charged for towing, storage, and other services. The defendant obtained this approval by filing with the department a notice listing the various charges, which the department would stamp "approved." The notice also included a statement about the defendant's policy of releasing towed vehicles only during normal business hours, so the department has

always been aware of that practice. During October, 1989, the defendant obtained approval from the department of a "release fee" of $22.50. Thereafter, the defendant changed its practice to allow the release of a vehicle to an owner at any time, provided the release fee was paid if the owner demanded the vehicle after normal business hours.

Prior to May, 1990, the defendant would not permit an owner to retrieve any personal property from his or her vehicle while it remained in the defendant's possession. On May 1, 1990, the defendant changed its practice to comply with new department of motor vehicles regulations requiring it to permit an owner at any time to remove from a vehicle personal property essential to the health or welfare of any person.

As previously indicated, the rates charged by the defendant for the work performed in towing and in storing trespassing vehicles are subject to approval by the department of motor vehicles. The defendant charges separately for hooking onto a vehicle and for towing it, for extra mileage, for unlocking the vehicle if necessary, for disconnecting and for reconnecting the transmission linkage if necessary, for the services of an extra man in the tow truck if necessary, for releasing the vehicle during nonbusiness hours as previously indicated, and for storing the vehicle before releasing it to the owner. Prior to October, 1989, the storage fee was imposed from the time the defendant notified the local police that it had the vehicle in its possession until the time the vehicle was released to the owner. In particular, the fee was imposed on Saturdays, Sundays, holidays, and for after business hours even if the owner had called or had appeared and had requested release. After October, 1989, the storage fee was imposed only until the time the defendant received a call from the owner requesting release of the vehicle.

At all times, the defendant has followed the practice of refusing to release a vehicle to its owner until the owner has paid the full amount of fees, calculated and charged by the defendant, in cash.

All of the practices described above, with some minor insignificant variations, are followed by most of the companies engaged in towing trespassing vehicles in Connecticut. These practices are standard in the industry in this state. None of the previously described practices violates any state statute or any regulation promulgated by the department of motor vehicles.

Ten witnesses, including the named plaintiff, testified on behalf of the plaintiff class. They were all owners of vehicles that had been parked on private property in various locations in the greater Hartford area without permission of the property owners and that had been towed away and stored by the defendant at the request of the property owners. Both men and women, they represent a variety of occupations, income levels, and racial backgrounds. They are not related or connected to each other in any way, but are simply individuals who share the common experience of having their vehicles seized and held by the defendant. The defendant also produced witnesses, including its president, Robert Spillane, and another employee but not the defendant Cheryl Spillane, who never testified. On the basis of all the testimony, much of which was in dispute, and on its assessment of the credibility of the various witnesses, the court finds the following additional facts. The defendant's employees rigorously enforced its previously described business practices, without regard to individual hardship or to special circumstances of which they were aware. In so doing, their manner was consistently overbearing, often rude and abusive, and occasionally marked by violence or threats. The following examples are illustrative of this conduct: At approximately 3 o'clock one morning, the plaintiff Jose

Rodriguez returned to his vehicle, which was admittedly parked in an unauthorized space in a private parking lot. Before he could leave, Spillane and another employee of the defendant hooked their tow truck to Rodriguez' vehicle. Rodriguez immediately demanded they stop and release the vehicle so that he himself could drive it from the lot. Spillane, however, refused to unhook it unless Rodriguez paid him $44.50 in cash on the spot. An argument ensued, and Rodriguez climbed into the back of the tow truck in an effort to prevent Spillane from driving away with his vehicle in tow. Instead, Spillane did drive off with Rodriguez in the back, towing the vehicle, and proceeded at high speed to his storage lot. Eventually, Rodriguez had to pay a total of $83 for the release of his vehicle.

On a Friday night in August, 1988, the defendant towed three cars from a private parking lot. They belonged to the plaintiff David Gostonon, his wife, and the best man at their wedding, which had taken place earlier that day. Gostonon and his wife were to embark on a weekend honeymoon on Saturday. The best man's car had some needed medication in it. On Saturday, Gostonon telephoned the defendant's office, explained the situation and requested release of the vehicles. His request was refused on the basis that the office was closed for the release of vehicles. On Monday, he had to pay towing and weekend storage charges of $187. Gostonon had had to cancel the honeymoon reservations. In addition to the severe inconvenience and disappointment he suffered, the defendant Cheryl Spillane was rude and abusive when he came to the office on Monday to retrieve the vehicles.

The plaintiff Lana Frederick's car was towed by the defendant on a Saturday morning in April, 1989. Although she informed the defendant by telephone that the car contained medication needed for her young daughter, the defendant refused to permit access or

to release the vehicle until the following Monday. When Frederick appeared on Monday and complained about the defendant's refusal, Robert Spillane cursed her and acted so as to threaten and to intimidate her.

The plaintiffs Donna Bodner and Ronald Regan were refused the release of their vehicles until they paid the full amount demanded by the defendant, notwithstanding their claims that the defendant had damaged their vehicles in towing them. Bodner was refused access to her vehicle until 8:30 a.m. on a Monday, although she had informed the defendant that she was on duty at 6 a.m. that day in a local hospital.

The plaintiffs' claims are all based on violations of their rights under CUTPA that are alleged to have been committed by the defendant in the operation of its business of removing wrongfully parked vehicles. The plaintiffs do not claim that the defendant had no right to take possession of the vehicles; rather, their claims relate to the conduct of the defendant after the defendant acquired possession.

Two of the plaintiffs' claims may be disposed of summarily. First, the defendant falsely advertised its services as "twenty-four hour light and heavy duty towing when, in fact, although the automobiles could be towed to the service center, they could not be retrieved by the owners of [the] vehicles." There was no evidence that such advertising caused any ascertainable loss to any member of the plaintiff class. They may not, therefore, maintain an action on that basis. General Statutes § 42-110g (a). The second claim without basis for recovery is that employees of the defendant "improperly and illegally entered . . . automobiles without the permission of the owners." Again, there was insufficient evidence that any member of the plaintiff class suffered any ascertainable loss as a result of an improper or illegal entry into an automobile. More-

over, when the defendant first took possession of the vehicle in each case, it was acting under the authority of General Statutes § 14-145, which permits a licensed tow company to remove wrongfully parked vehicles at the request of the property owner. There was sufficient evidence for the court to conclude that access to the interior of a parked vehicle is often necessary to prepare the vehicle for towing by straightening the wheels and by taking it out of gear, where possible. Since these procedures tend to reduce potential damage to the vehicle, they are not improper. Since they are reasonably necessary to the legal removal and towing operation, they are not illegal. The plaintiffs' remaining three claims require individual discussion.

Central to all of the plaintiffs' claims is their contention that it is an unfair trade practice under CUTPA for the defendant to refuse to release a vehicle to its owner until the owner has paid the full amount charged by the defendant for towing, storage and ancillary services. It is undisputed, of course, that the defendant has followed this practice at all times in its dealings with all of the plaintiffs in the class. Robert Spillane testified, furthermore, that the defendant will continue to follow its no pay, no release policy unless and until it is ordered to cease.

Section 42-110b, the statute in question, provides in relevant part: "(a) No person shall engage in unfair . . . acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section . . . the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act . . . ." In *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 568, 473 A.2d 1185 (1984), the

Supreme Court affirmed the following criteria for determining when a practice is unfair: " '(1) [W]hether the practice, without necesarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].' " The court, quoting *FTC* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972), noted that these criteria have been adopted by the federal trade commission.

The defendant advances a number of arguments, incoporated into its special defenses, to support its position that the refusal to release a vehicle to its owner on demand without first obtaining payment in full of all charges is a legitimate business practice that is not unfair to the owner or to anyone else. These arguments may be grouped into three categories. First, the defendant contends that the practice is absolutely essential in the business of towing trespassing vehicles. There was testimony that it would be impractical and financially unfeasible to collect the relatively small charges (the average is about $100) from an irate owner after he or she has recovered possession and has left the defendant's premises. The defendant claims, in effect, that it is necessary to coerce payment in advance by detaining the vehicle. There was also testimony from the private parking lot owners who initially requested the defendant to remove the trespassing vehicles, that they are unwilling to pay for the service themselves. These factors, the defendant argues, require the creation of a lien on the vehicle in favor of the towing company.

In the same category as the "business necessity" argument is the argument based on considerations labeled by the defendant as "public policy." This argument assumes that the towing companies, for financial and practical reasons, would require advance payment from the property owners if they could not enforce, by lien, payment from the vehicle owners. The property owners, for their own financial reasons, would then pass this added cost of doing business on to their tenants. Residential tenants would be burdened by higher rents or perhaps would forfeit parking privileges, and commercial tenants would pass the higher rent charges onto their customers. Depriving the towing companies of the power to impose a possessory lien, the defendant contends, would thus have economic consequences that would be harmful to the general public.

The defendant's contention that it has, or should have, a possessory lien on the towed vehicles such that it may require payment of towing, storage and miscellaneous charges as a condition precedent to releasing the vehicles to their owners cannot be sustained. Under Connecticut law, " 'a lien can only be created with the owner's consent; that is, by a contract express or implied with the owner's consent; that is, by a contract express or implied with the owner of the property . . . or without his consent by the operation of some positive rule of law, as by statute.' " *Paton* v. *Robinson,* 81 Conn. 547, 554, 71 A. 730 (1909). There was obviously no express contract between the owners of any towed vehicles and the defendant in this case, and the circumstances do not warrant a finding that an implied or quasi contract existed that would support a lien to secure payment.

In *Connors* v. *Wilkinson,* 34 Conn. Sup. 270, 274, 387 A.2d 568 (1978), a case involving some of the same principles as the present one in a different factual context, the court, citing *State* v. *Newman,* 140 Conn. 214, 99 A.2d 110 (1953), and *Providence Electric Co.* v. *Sutton*

*Place, Inc.,* 161 Conn. 242, 287 A.2d 379 (1971), held that neither an implied nor a quasi contract existed because the owner of the towed vehicle received no benefit or anything of value from the transaction. Similarly, the plaintiffs in the present case received no benefit from the seizure and detainer of their vehicles; the benefit from those activities inured solely to the property owners and to the defendant.

Other evidence introduced by the defendant to show consent on the part of the plaintiffs consisted of photographs of signs posted on property where some of the plaintiffs had parked their vehicles and the testimony of some of the plaintiffs that they had not specifically demanded the release of their vehicles without being required to pay the charges. The signs in question warn simply that unauthorized vehicles will be towed "at the owner's expense." Certainly, such signs in some cases would support claims against the owners of the vehicles for payment of the expenses. They are not, however, evidence of the consent of the owners, express or implied, to surrender the right to possession of their vehicles until such payment is made. Since the signs do not even specify that it is the towing company that will impose and collect the charges (rather than the parking lot owner who posted the sign and who requested the towing), they can hardly be said to notify a vehicle owner of the potential detainer by the tower. Without some warning, however, the vehicle owner cannot fairly be held to have consented to the lien.

Finally, the fact that some of the plaintiffs did not specifically object to the defendant's practice at the time is not evidence that they consented to it. Those who did not so object testified that they knew from the defendant's acts and words that opposition would be futile. The court accepts their testimony and finds that their silence did not signify consent under the circumstances.

Although Connecticut case law clearly and strongly suggests, as previously indicated, that no lien on the towed vehicles exists in favor of the defendant towing company, there is no state court decision specifically on point. In *Tedeschi* v. *Blackwood,* 410 F. Sup. 34, 42 (Conn. 1976), however, the federal district court, citing *Paton* v. *Robinson,* supra, held that Connecticut common law does not recognize a lien on a motor vehicle in favor of a towing company that has gained possession of the vehicle without the owner's consent. *Tedeschi* involved a constitutional challenge to General Statutes § 14-150, a statute with no bearing on the present case. The court's ruling on the lien question, however, was based on a nearly identical fact pattern. This court considers the *Tedeschi* decision to be extremely pursuasive. Furthermore, in other jurisdictions, courts have uniformly held that a towing company acquires no lien on a vehicle that has been towed under the circumstances of the present case. See *Younger* v. *Plunkett,* 395 F. Sup. 702 (D. Pa. 1975); *Capson* v. *Superior Court,* 139 Ariz. 113, 677 P.2d 276 (1984); *Murrell* v. *Trio Towing Service, Inc.,* 294 So. 2d 331 (Fla. 1974); *Kunde* v. *Biddle,* 41 Ill. App. 3d 223, 353 N.E.2d 410 (1976); 48 A.L.R.2d 894.

The court should not depart from the established common law of this state and of other jurisdictions so as to authorize or to create a lien in favor of the defendant and adverse to the plaintiffs. Such action would involve the balancing of conflicting economic interests and property rights. Indeed, most of the defendant's arguments are based on such public policy considerations. A change in the law in this area, if it is to be effected, is the task of the legislature, not the courts. In the regulation of business transactions, "the legislature . . . has broad discretion in passing on the interest to be protected and the method to be employed." *Real Estate Listing Service, Inc.* v. *Real*

*Estate Commission,* 179 Conn. 128, 137, 425 A.2d 581 (1979). Furthermore, the general assembly *has* changed the common law of the state in this general area by enacting General Statutes § 14-150. That statute creates a lien on an offending vehicle that has been towed from a public highway at the request of the police or other public official. By contrast, when the General Assembly enacted General Statutes § 14-145, which covers towing unauthorized vehicles from private property as in the present case, it did not include a provision creating a lien on those vehicles. Thus, the General Assembly has demonstrated its jurisdiction over the general subject matter. It has also revealed its legislative scheme, which is to leave intact the common law with respect to vehicles towed from private property without the consent of the vehicle owners. " 'No statute is to be construed as altering the common law farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.' " *Dennis* v. *Shaw,* 137 Conn. 450, 452, 78 A.2d 691 (1951); *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 137, 479 A.2d 231 (1984). No lien in favor of the defendant exists at common law or by statute, and this court cannot change the law in that regard. In the absence of a valid lien, the defendant has no right to refuse delivery of a towed vehicle to its owner upon demand.

The defendant's second argument that its no pay, no release policy is not unfair is based on its contention that the practice is standard in the industry and is sanctioned by implication by the department of motor vehicles. The evidence before the court confirmed the defendant's assertion that the practice is followed by virtually all towing companies in the state at this time. The evidence also established that the motor vehicle department officials in charge of regulating the defendant's business are aware of the practice, having

received some complaints from vehicle owners about it, but have taken no action to prohibit it. They testified, however, that they have adopted this hands-off policy because there are no regulations or statutes covering the practice and because they regard it as a type of "condition of payment," which is presently outside their jurisdiction. In essence, the department's position is neutral on the subject. These facts are, of course, relevant to the central issue before the court; that is, whether the defendant's refusal to release a vehicle to its owner unconditionally and on demand is an unfair trade practice under the broad language of CUTPA and under the court decisions construing that statute. These facts are not controlling in determining whether the practice violates CUTPA, however, and must be weighed by the court with other facts in reaching its conclusion.

The defendant's third argument that its policy is not an unfair trade practice is that the plaintiffs themselves are trespassers. They have invited the defendant's actions by their own conduct. In short, they do not come to court with "clean hands." This argument is without merit. The plaintiffs do not claim that the defendant had no right to remove their vehicles. In effect, the plaintiffs admit they trespassed. Their claims, however, are based on conduct of the defendant that is wholly unrelated to the trespass; that is, the alleged wrongful detainer of the vehicles after they had been rightfully removed. Furthermore, the trespassing by the plaintiffs, which is the basis of the "unclean hands" allegation, was committed against the property owners, not the defendant. The defendant was not harmed in the slightest degree by the trespassing. "[I]t is a well-established rule . . . that '[t]he party . . . complaining that his opponent is in court with "unclean hands" . . . must show that he himself has been injured by such conduct. . . . The wrong must have been done

to the [party] himself and *not to some third party.'* (Emphasis added.)" *Cohen* v. *Cohen,* 182 Conn. 193, 206, 438 A.2d 55 (1980).

After consideration of all of the evidence and applicable law, this court concludes that the defendant's no pay, no release policy is an unfair trade practice under CUTPA. Specifically, the practice constitutes, in each individual case, an intentional conversion of the vehicle by the defendant. " ' "Conversion is . . . [the] unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . The essence of the wrong is that the property rights of the [owner] have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. . . . (Citations omitted.)" ' " *Falker* v. *Samperi,* 190 Conn. 412, 419–20, 461 A.2d 681 (1983).

The wrong is committed even though the initial acquisition of the owner's property may have been legitimate. "[P]ossesion, originally rightful, becomes wrongful by reason thereafter of a wrongful detention, or a wrongful use of the property, or the exercise of an unauthorized dominion over the property." *Coleman* v. *Francis,* 102 Conn. 612, 616, 129 A. 718 (1925). The wrongful act is committed when the possessor refuses to deliver the property to the owner on demand. Id. In the present case, the defendant's possession of the vehicles was originally lawful pursuant to § 14-145, and continued to be lawful up to the time when an owner demanded the return of his vehicle. At that point, the defendant's right to possession of the vehicle was extinguished. There was no lien or other justification of any nature for holding the vehicle against the wishes of the owner. Specifically, the refusal to release the vehicle after demand by the owner, in order to extract payment of towing and storage charges, constituted conversion. Nor was it necessary, in order for the conversion to have been

committed, that the owner voiced his demand in a particular manner. So long as the owner conveyed by words or conduct that he desired the return of the vehicle, the defendant had no right not to comply and no right to impose any conditions of payment on the return.

Although no Connecticut case is exactly on point, cases from other jurisdictions, previously cited here, support this court's conclusion that the defendant's refusal to release the vehicles amounted to conversion. See *Capson* v. *Superior Court,* supra; *Murrell* v. *Trio Towing Service, Inc.,* supra; *Kunde* v. *Biddle,* supra.

Conversion, or the unauthorized taking or retention of the property of another, is, of course, wrongful conduct under the common law. Clearly, therefore, it is a "practice . . . [which] offends public policy as it has been established by . . . the common law" and violates CUTPA under the rule set forth in *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* supra. This court also finds that the conduct of the defendant in converting the plaintiffs' vehicles was "oppressive" and caused them "substantial injury" as those terms are used by the court in *McLaughlin Ford, Inc.* The court's finding in this regard is based on two factors. First, the defendant's insistence on advance payment in full of all charges as calculated by the defendant deprived the vehicle owner of any effective means of contesting the amount of the charges or of asserting any offsetting claims that he might have had against the defendant. Several plaintiffs testified, for example, that their vehicles were damaged while in the defendant's possession. Others claimed that the charges were excessive. At least one plaintiff claimed that she did not park her vehicle in the unauthorized space, thereby raising the question of whether she should be held liable at all for the defendant's charges. See *Baumert-Moran Sales Co.* v. *Red Bird Truck Rental Corporation,* 149 Conn. 42,

175 A.2d 189 (1961), which held that an owner of a vehicle is not necessarily liable for repairs that someone else in possession of the vehicle may have ordered. The point to all of these examples is not that the vehicle owners' claims were necessarily legitimate, but rather, that the defendant's intentional, wrongful detainer of the vehicles was an effective means of squelching those claims forever. That was oppressive and plainly injurious to the plaintiffs.

A second factor in the court's conclusion that the conversions of the vehicles were oppressive and injurious was the manner in which the defendant committed the wrongs. As described above, the defendant pursued its practice ruthlessly, and sometimes violently, without regard to special circumstances. The incident involving the plaintiff Rodriguez, who vainly attempted to prevent the defendant from towing his vehicle right out from under him, illustrates the defendant's "might makes right" attitude that is the essence of all oppression.

The fact that the defendant's practice is standard in the industry and has not been prohibited by the department of motor vehicles does not excuse it as a violation of CUTPA. As the court in *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, supra, indicated, a practice may be an unfair trade practice even "without necessarily having been previously considered unlawful." In other words, the fact that the practice has been followed in the past by the defendant and others in the same business and has been ignored by the department of motor vehicles does not elevate it to the level of public policy. Rather, it offends public policy by violating the common law and by its oppressive nature and injurious consequences.

Until October, 1989, the defendant refused to permit an owner to regain possession of a towed vehicle except during weekday business hours selected by the

defendant. This was so even though the defendant engaged in the towing aspect of its business twenty-four hours a day, seven days a week. As a result of this practice, many of the plaintiffs were forced to wait one or two days after demanding their vehicles until the defendant opened for "business" on Monday morning. The only reason that the defendant restricted its hours of operation for the release of vehicles was that it had been unable to obtain approval from the department of motor vehicles of an extra fee to charge for weekend or after hours service. As soon as the extra charge was approved in October, 1989, the defendant changed its practice and began releasing vehicles during off business hours upon payment of the extra fee.

The court concludes that the refusal to release a vehicle within a reasonable time after demand by the owner, regardless of the hour or day, was an unfair practice in violation of CUTPA. This court already held that the defendant's detainer of a vehicle in the face of a demand for its release by the owner constituted a conversion. That conclusion was based on the absence of any lien in favor of the defendant and the consequent immediate right to possession by the owner on demand. It follows that the defendant had no right to delay unreasonably the return of a vehicle after a demand by the owner. Such a delay was plainly inconsistent with the owner's right to immediate possession. In all of the instances in question here, the delay was based solely on the defendant's convenience and on the desire to impose an extra charge. There was no evidence that it was impossible for the defendant to release vehicles at any time, day or night. Indeed, Robert Spillane testified that he now routinely responds to requests at all hours. The fact that the defendant has always conducted its towing operations for its property owner customers on an around-the-clock schedule is further convincing evidence that it was unreasonble for it not

to have likewise accommodated the plaintiff vehicle owners who demanded the return of their vehicles during nonbusiness hours.

In addition to violating the owner's common law right to immediate possession of his property, the defendant's delay in returning the vehicles was oppressive and caused substantial injury to the plaintiffs. It requires no citation of sociological data or legal precedent to state that an automobile is one of life's necessities in present society. The car is essential for transport to work and to school, for sudden emergencies and for planned trips. For better or worse, automobiles are an integral part of our daily existence, and they must be readily accessible. As described above, the testimony of many of the plaintiffs who were deprived of their vehicles was powerful evidence of the real hardship that the defendant's business practice caused. Since there was no justification for the practice under the law and since the defendant was aware of the hardship in all cases, its refusal to release vehicles to their owners within a reasonable time after demand was oppressive and obviously injurious.

All of the factors set forth above apply equally to the defendant's practice, prior to May 1, 1990, of refusing to allow an owner access to his vehicle while it was held in the defendant's possession. The defendant's practice changed in May, 1990, in compliance with new department of motor vehicles regulations. The court finds, however, that the defendant's practice prior to May 1, 1990, was an unfair trade practice under CUTPA.

Prior to October, 1989, when the defendant refused to release vehicles to their owners except between the hours of 8:30 a.m. to 4:30 p.m., Monday to Friday, the defendant imposed and collected a fee for storing a vehicle even if it had received a demand for its release.

Thus, the named plaintiff, for example, demanded the release of his vehicle on a Friday night, and then again on Saturday and on Sunday, but was refused until the following Monday morning at 8:30. Nevertheless, the defendant imposed and collected (under pain of further detaining the vehicle) storage charges for Saturday and Sunday. This practice, like the others under review, was followed consistently and rigorously. The court's findings and conclusions with respect to the defendant's retention of the vehicles after demand by the owners necessarily leads to the conclusion that the collection of these storage fees was an unfair business practice under CUTPA. As stated above, the owner's demand for his vehicle extinguished the defendant's right to possession. Since it had no such right and since the storage obviously did not benefit the plaintiffs in any respect, being against their wishes, the imposition and collection of storage charges merely added further injury to the plaintiffs. Furthermore, the manner of collection, that is, holding the vehicles hostage for payment, was inherently oppressive. It should be noted that the court's holding in this area is confined to those storage charges pertaining to periods of time after an owner demanded the return of the vehicle. As indicated previously, other circumstances, such as warning signs on the property, might impose liability on the vehicles owner for storage fees for periods prior to a demand for the return of the vehicle.

To summarize, this court finds that the following acts or practices of the defendant in the conduct of its business are or were unfair and, therefore, in violation of § 42-110a et seq.: (1) the defendant's requiring payment of towing, storage and miscellaneous charges as a condition precedent to releasing a vehicle to its owner, when the defendant's acquisition of the vehicles was without the owner's consent; (2) the defendant's refusal to permit an owner access to or release of his vehicle

except on weekdays between 8:30 a.m. and 4:30 p.m., when the defendant's acquisition of the vehicle was without the owner's consent; and (3) the imposition of storage charges after demand by the owner for release of the vehicle, when the defendant's acquisition of the vehicle was without the owner's consent.

General Statutes § 42-110g provides that the court may award compensatory damages, punitive damages, attorney fees and costs, and may order appropriate equitable relief. Pursuant to a stipulation by the parties, this court at this time determines only the issues of liability and injunctive relief. Accordingly, this court makes the following findings and orders: (1) The defendants are liable to the plaintiffs for damages, attorney fees and costs as provided by CUTPA and in amounts as may be determined at a subsequent trial of those issues to a jury; (2) the defendants are permanently enjoined from engaging in the acts and practices found by this court to be unfair and in violation of CUTPA. Specifically, the defendants are enjoined from requiring payment of charges as a condition precent to releasing a vehicle to its owner. The defendants are further enjoined from refusing to release or to provide access to a vehicle by its owner, unconditionally and within a reasonable time after the owner has made demand, orally or otherwise, for such release or access. For purposes of this order, "reasonable time" means a period of time not in excess of four hours. The defendant is further enjoined from imposing charges for storing a vehicle after the owner has made demand for its release. These orders apply to all vehicles that the defendant may acquire without the consent of the vehicle owners pursuant to § 14-145 or other provisions of law.