POOLER, Circuit Judge, concurring in part and dissenting in part:
Direct Energy sucked customers in with an appealing teaser rate only to later jack up the cost when those customers would not notice. The temptation of this siren-like path was no accident. Direct Energy created "glide paths" to ensure customers were lulled into inattentiveness. It ramped up rates for those who were inattentive to begin with. And then it capitalized on its customers' lack of awareness. I am convinced that a jury could reasonably conclude that this pricing practice is unfair. Accordingly, I dissent from the majority's conclusion that Direct Energy did not *107 commit an unfair practice or breach its contract with its customers. However, I concur that Direct Energy did not, as a matter of law, engage in deceptive practices, commit a per se CUTPA violation, or breach any implied contract.
Utility deregulation initially promised that introducing competition would make electricity and gas service more reliable at lower prices, perhaps even encouraging green energy alternatives. Those hopes have run up against unforeseen realities. See generally Electricity Deregulation: Choices and Challenges 145 (James M. Griffin & Steven L. Puller eds., 2005). This suit is one of a wave of cases to hit the courts alleging that electricity providers like Direct Energy are manipulating their pricing structures to enable them to charge well more than the regulated rate for the same service without their customers' noticing. Competition cannot deliver its advertised benefits when businesses subvert consumer choice in this way. When the legislature has given courts tools to address such abuses, we should not shy away from using them with the expectation that the market will work itself out. Doing so relies on our hopes for, rather than the reality of, market competition.
A reasonable jury could easily conclude that at least part of Direct Energy's business model was to predict, encourage, and profit off of its customers' inattention. Direct Energy does not dispute that it set its variable rates as high as it possibly could without attracting the attention of its customers. That includes setting higher rates for a subset of customers who would be less likely to notice and creating "glide paths" to make all of its customers less likely to notice. A reasonable jury could also conclude that the letter and spirit of Direct Energy's boilerplate contract language did not allow for those pricing practices.
A. Unfairness under CUTPA
Connecticut courts "have adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair [under CUTPA]: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businesspersons." Landmark Inv. Grp., LLC v. CALCO Constr. and Dev. Co. , 318 Conn. 847, 880, 124 A.3d 847 (2015) (brackets omitted).
The majority errs in finding "Connecticut law ... clear that widespread business practices that are consistent with 'common business norms' do not violate CUTPA." Majority op. at 104 (quoting Landmark Inv. Grp., LLC v. Calco Constr. and Dev. Co. , 141 Conn. App. 40, 55, 60 A.3d 983 (Conn. App. 2013) ). To the contrary: in Connecticut, "[t]he fact that the defendant's practice is standard in the industry ... does not excuse it as a violation of CUTPA." Halloran v. Spillane's Servicenter, Inc. , 41 Conn. Supp. 484, 500, 587 A.2d 176 (Conn. Super. Ct. 1990) (emphasis added). "Common business norms" are to be considered at most as part of a court's determination of whether the criterion of unscrupulousness is satisfied, not as dispositive evidence of what is and is not unfair.
That a business practice has "not previously [been] considered unlawful" cannot be considered a defense, as the purpose of unfairness doctrine is "to create a new body of law ... adapted to the diverse and *108 changing needs of a complex and evolving competitive system." In re Pfizer Inc. , 81 F.T.C. 23, 28 (1972) ; see also Sperry & Hutchinson , 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (comparing the FTC to a "court of equity"). My colleagues suggest that in Connecticut unfairness is a rarity and "the core of unfair practices [is]: 'withholding material information; (2) making unsubstantiated advertising claims; using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies.' " Majority op. at 102 (citing A-G Foods, Inc. v. Pepperidge Farm, Inc. , 216 Conn. 200, 216 n.9, 579 A.2d 69 (1990) (quoting Am. Fin. Servs. Ass'n v. F.T.C. , 767 F.2d 957, 979 (D.C. Cir. 1985) ). But neither Connecticut law nor unfairness jurisprudence more generally has restricted the doctrine to those categories.[1] And more recent FTC enforcement actions-targeting data privacy breaches, for instance-suggest that unfairness doctrine continues to evolve beyond the purported "core" my colleagues identify. Cf. , e.g. , F.T.C. v. Wyndham Worldwide Corp. , 799 F.3d 236 (3d Cir. 2015) (upholding an FTC enforcement against a hotel chain that had extremely lax cybersecurity protecting its customers' financial and personal identifying information).
Here, a reasonable jury could conclude that Direct Energy's pricing strategy was an unfair practice. "Whether a practice is unfair and thus violates CUTPA is an issue of fact." Landmark , 318 Conn. at 881, 124 A.3d 847 (brackets and internal quotation marks omitted). Accordingly, our task at this stage is not to determine whether Direct Energy's practices were unfair or not. Instead, the grant of summary judgment should be affirmed only if it can be concluded that no reasonable jury could find Direct Energy's practices were unfair on any of the cigarette rule's criteria.
The FTC considers the third prong of the cigarette test-sometimes called "unjustified consumer injury"-as "the primary focus of the FTC Act." Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), available at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm ("FTC Policy Statement"). Following the Connecticut legislature's directive to be "guided by interpretations given by the Federal Trade Commission and the federal courts to [the FTC Act]," Conn. Gen. Stat. § 42-110b(b), the Connecticut Supreme Court has acknowledged that unjustified consumer injury is "the most important of the three ... criteria" in the cigarette rule, A-G Foods, Inc. , 216 Conn. at 215-16, 579 A.2d 69 (internal quotation marks omitted).
Connecticut courts have also adopted the FTC's guidance that an "injury must satisfy three tests" to be considered unfair: "[1] [i]t must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the *109 practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." Id. at 216, 579 A.2d 69, 77 (quoting FTC Policy Statement, supra ) (emphasis removed). The majority deems Richards's individual harm insubstantial, but that misses the point. For an injury to be substantial, "it need not take the form of a single crushing loss." Neil W. Averitt, The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act , 70 Geo. L.J. 225, 246 (1981). Instead, "[a] recognizable harm may be one that does great injury to a small number of people, or small injury to a great number of people." Id. Here, Richards purports to represent a class of consumers who, in the aggregate, have lost $11.2 million-plainly a substantial injury.[2]
Though the majority asserts that we should categorically exclude the possibility that "offering a teaser rate" is "substantially injurious on its own, especially when, as here, consumers can cancel the contract whenever they like without paying any fee," Majority op. at 102-03, they offer no good reason why that should be so. As they acknowledge, the mere fact that a customer can opt out of an auto-renewing contract at any time without breaching it does not mean that the customers will do so when it is in their interest. People are inertial. The same people who spend hours comparing electricity prices (or credit card rates or online streaming services or magazine subscriptions or gym memberships) are quite unlikely to maintain that level of vigilance once they have habitually received and paid for electricity (or other goods or services) for months or years on end. Unfairness doctrine is designed to police such circumstances when businesses exploit those consumer vulnerabilities. Cf. Averitt, The Meaning of "Unfair Acts or Practices ", 70 Geo. L.J. at 251-52 ("An unfairness action ... will be appropriate only when the respondent's methods have undermined the ability of consumers to protect themselves."). A business that designs its price structure so that those who are not attentive pay significantly more than they would if they were attentive is fairly characterized as causing unjustified consumer injury. Direct Energy does not dispute that it set variable rates as high as it could without attracting the attention of customers whom it knew would be paying little attention or that, if its customers had been paying attention, they would have been better off. A jury should decide if such practice is unfair.
The majority notes that Richards saved money during the teaser/fixed rate period of the contract relative to those who paid the regulated rate-something that seems to be true of many of Direct Energy's customers. But that fact is entirely consistent with Richards's theory of the case: Direct Energy undercut other suppliers' prices to lure customers in, knowing that it could overcharge them once they had been customers long enough. In other words, had Richards not saved during the fixed term, Direct Energy would never have been able to overcharge. That it took only three months of inattention after the fixed rate's expiration to vitiate a full year's *110 worth of savings provides support for Richards's theory.[3]
A jury could reasonably find that Direct Energy's strategies to avoid alerting customers to their rising rates,[4] together with predictable consumer inertia, imply that consumers could not reasonably avoid paying the higher rates. Only those who are most anxious about money or most scrupulous about their affairs are likely to pay close attention to the rate they are charged for energy (rather than the gross amount, which varies seasonally and may be due to one's own changes in energy use) and to engage in monthly price comparisons of this rate.
The majority reasons that the fact that "Connecticut chose to deregulate consumer electricity ratemaking" suggests that it did not seek to "transfer that authority from a public utility commission to the after-the-fact judgments of courts interpreting CUTPA." Maj. op. at 104. But to infer the latter from the former is to overread the meaning of "deregulate." As it is used in the context of electricity (and other utilities), "deregulation" is shorthand only for a state's decision to allow more than one company to sell electricity to its residents. Electricity provision is still highly regulated: public utilities still own and operate the physical infrastructure (i.e. the wires, poles, transformers, etc.) subject to state regulation; only licensed companies can use this infrastructure to provide electricity; those companies are required to make a number of disclosures and to meet several state-promulgated standards; electricity markets largely take place on exchanges created, managed, and regulated by the state; the prices electricity companies charge are affected by the fact that they have to compete with the still-regulated rates of the public utilities; etc. A state that chooses to regulate its electricity provision in part through managed competition does not retreat from any regulation whatsoever.
B. Good Faith and Breach of Contract
I also disagree with my colleagues that "Richards's CUTPA claims are almost entirely duplicative of his contract claim." Maj. op. at 100. Even if Direct Energy reserved itself absolute discretion in the contract, it is reasonable for a jury to conclude that it took advantage of its customers. I now turn to whether Direct Energy's contract permitted it to set prices in the way it did. A reasonable jury could conclude that the contract did not enable Direct Energy's practices.
First, it is not a foregone conclusion that cross-subsidization, pegging prices to competitors', and price smoothing are pricing strategies that are "based upon business and market conditions." Maj. op. at 98.
*111 The majority concludes that since any condition Direct Energy faces is either a "business condition" or a "market condition," Direct Energy has effectively granted itself unmitigated discretion to set prices. If its customers don't like the price they are getting, the majority reasons, those customers can leave.
Just as reasonable, though, is the interpretation that the phrase "business and market conditions" only includes those conditions that affect Direct Energy's costs of providing electricity. On this reading, "business conditions" refers to relatively fixed costs of labor, facilities, legal representation, and the like, while "market conditions" refers to the more variable cost of purchasing electricity and electricity derivatives. Cf. Mirkin v. Viridian Energy, Inc. , No. 15-cv-1057, 2016 WL 3661106, at *8 (D. Conn. July 5, 2016) (discussing a contract that included "a variable rate based on wholesale market conditions" as a basis to find a breach when prices were not set based on wholesale prices); Edwards v. N. Am. Power & Gas, LLC , 120 F.Supp.3d 132, 143 (D. Conn. 2015) ("While the text of the contract itself does not indicate that NAPG prices would definitively or precisely be linked with the wholesale market price, with or without the marketing materials, it is plausible that a reasonable consumer would infer a direct link between the two."); Claridge v. N. Am. Power & Gas, LLC , No. 15-cv-1261, 2015 WL 5155934, at *4-6 (S.D.N.Y. Sept. 2, 2015) (finding bad faith on a contract that guaranteed "variable market rates" according to an unspecified formula). Direct Energy notified consumers that its variable rates would be calibrated to pass on its costs-i.e. there would be risk-sharing-but did not place customers on notice that it would set prices in whatever matter it calculated to be most profitable.
In Connecticut, "[w]hen the language of a contract is ambiguous, the determination of the parties' intent is a question of fact" to be submitted to a jury. Gabriel v. Gabriel , 324 Conn. 324, 341, 152 A.3d 1230 (2016). "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts § 206 ; see also Williston on Contracts § 32:13 (4th ed. 2017). A reasonable juror could find that Direct Energy tied its price-setting discretion to its cost of doing business. Cf. Silvis v. Ambit Energy L.P. , 674 F. App'x 164, 168 (3d Cir. 2017) (finding that a clause that permitted price to "vary dependent upon price fluctuations in the energy and capacity markets" was ambiguous because it was unclear whether the phrase "may vary" afforded the electricity supplier complete discretion in setting rates, or whether that discretion was limited by the clause "dependent upon price fluctuations in the energy and capacity markets").
Under Connecticut law, when a contract gives one party discretion to determine how to render performance on an open-ended term, "it is axiomatic that the duty of good faith and fair dealing" is read into the contract to cabin that discretion and avoid rendering the obligation illusory. De La Concha of Hartford, Inc. v. Aetna Life Ins. Co. , 269 Conn. 424, 432, 849 A.2d 382 (2004) (internal punctuation and quotation marks omitted). "The majority of courts have held that subjective bad faith is irrelevant" and that a seller who objectively does not "charge commercially reasonable amounts" or who "discriminate[s] among its purchasers" fails to act in good faith. Marcus Dairy, Inc. v. Rollin Dairy Corp. , No. 05-cv-589, 2008 WL 4425954, at *8 (D. Conn. Sept. 24, 2008) (internal quotation marks omitted). In Connecticut, "a neglect *112 or refusal to fulfill some duty ... not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive" may suffice to demonstrate bad faith. De La Concha , 269 Conn. at 433, 849 A.2d 382 (quoting Habetz v. Condon , 224 Conn. 231, 237, 618 A.2d 501 (1992) ).
Whether a party has acted in good faith or not is a question of fact for the jury. See Renaissance Mgmt. Co. v. Conn. Housing Fin. Auth. , 281 Conn. 227, 240-41, 915 A.2d 290 (2007). The facts on this record would allow a jury to conclude that Direct Energy's pricing practices undermined the legitimate expectations[5] set by the contract. It is uncontested that Direct Energy set monthly variable rate prices for reasons other than passing on the cost of providing electricity for that month. It raised variable-rate prices to recoup anticipated losses among fixed-rate customers, and it smoothed variable-rate prices so that customers would not notice how high they were getting. A jury should determine whether Direct Energy's reasons amounted to bad faith or a breach of the contract given the letter and spirit of the contract-a question this Court should not answer in the jury's place. Cf. Edwards , 120 F.Supp.3d at 147 ("While the contract left the price open to be set at NAPG's discretion with certain limitations, the covenant of good faith and fair dealing mandates that NAPG exercise that discretion reasonably by charging a commercially reasonable price.").
C. Dismissal of Massachusetts Claims
Another panel of this Court recently rejected the rationale supporting the district court's dismissal of Richards's Massachusetts-based claims for lack of standing:
in Richards v. Direct Energy Servs., LLC , the district court concluded that a Connecticut plaintiff that alleged that the defendant energy company had attracted customers with misleading promises of low rates lacked standing to sue on behalf of Massachusetts consumers who were injured by the same defendant. 120 F.Supp.3d at 151. The court reasoned that "[w]ithout an allegation that [the named plaintiff] personally was injured in Massachusetts," the plaintiff's claim was essentially that, like the plaintiffs in Massachusetts, he had "suffered in some indefinite way in common with people generally." Id. at 155 (internal quotation marks and alteration omitted). This reasoning falters upon its premise: the harm the plaintiff alleged was not a general grievance common to people generally; it was a specific grievance based on the defendant's falsely advertised rates, suffered by specific people (Connecticut and Massachusetts customers of the defendant), under a specific set of circumstances. See id. We fail to see how the fact that the defendant's wrongful conduct impacted customers in two states rendered the injuries of the Massachusetts consumers somehow more indefinite than the identical injuries of the Connecticut consumers.
Langan v. Johnson & Johnson Consumer Cos., Inc. , 897 F.3d 88, 96 (2d Cir. 2018). The question of "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance *113 under Rule 23(b)(3), not a question of standing under Article III." Id. I would remand this case to the district court to determine, under Rule 23, whether a class should be certified and whether it should include Massachusetts consumers.
In sum, I would vacate the district court's grant of summary judgment with respect to the unfairness and contract claims and remand for consideration of class certification in the first instance.

Those categories were identified in 1981 by an FTC staffer as an effort to "catalogu[e] some of the most common commercial practices whose unfairness ... has already been litigated and established" up to that point and not to "settle any controversy about how [unfairness] ought to be used." Richard Craswell, The Identification of Unfair Acts and Practices by the Federal Trade Commission , 81 Wisc. L. Rev. 107, 108-09 (1981). The D.C. Circuit referred to them in considering the meaning of "unfairness"-correctly identifying them as emanating from an "article authored by a member of the [FTC's] Office of Planning," rather than the FTC itself. Am. Fin. Servs. Ass'n , 767 F.2d at 979. Connecticut's Supreme Court quoted the D.C. Circuit decision in a footnote of just one of its decisions, incorrectly identifying the categories as promulgated by the FTC and never suggesting that they restricted the universe of unfair practices. A-G Foods, Inc. , 216 Conn. at 216 n.9, 579 A.2d 69.

This number represents the amount of money Direct Energy made on its variable-rate customers less the amount of money it would have made if it had added the same mark-up it does for its fixed-rate customers (which Direct Energy itself referred to as its "benchmark" profit margin). In other words, it takes into account the costs Direct Energy actually paid and the mark-up it uses in its own accounting. It does not , contrary to my colleagues' suggestions, represent the amount by which Direct Energy's variable rate prices exceed the regulated rate. That amount is $29 million-or nearly three times as much.

The majority harps on the fact that Richards's rate was around "two cents above the PURA-approved Standard Service Rate" when his variable-rate contract kicked in. Majority op. at 104. That is a misleading way to put it. We have to take scale into account: the Standard Service Rate during this period was around eight cents per kilowatt hour. Two cents above the Standard Service rate is thus 125% of the Standard Service Rate. By comparison, Richards's fixed rate price of $.0745 only saved him approximately one half a cent per month, or 6% of the Standard Service Rate.

Direct Energy claims that it sent notices in the mail to its customers indicating that the fixed rate period was about to expire, although Connecticut's electricity regulator, PURA, made a finding in 2015 that Direct Energy had failed to do so in at least some cases. See Richards v. Direct Energy Servs., LLC , 246 F.Supp.3d 538, 555-56 (D. Conn. 2017). Even if Direct Energy did send such notices to all of its customers, it clearly could have done more if it truly wanted them to switch back to a fixed-rate plan.

Consumers' expectations about the meaning of a term in the fine print of an adhesive contract are nearly always legal fictions, but the law is clear that they are fictions on which we are to rely. One recent suggestion to tether these fictions to reality is the admission of survey evidence on what particular passages mean. See Omri Ben-Shahar & Lior Jacob Strahilevitz, Interpreting Contracts via Surveys and Experiments , 92 N.Y.U. L. Rev. 1753 (2017).