RICHARD MELILLO ET AL. *v.* CITY OF NEW HAVEN
(SC 15811)

Callahan, C. J., and Borden, Berdon, Katz and Palmer, Js.

Argued October 1, 1998—officially released June 1, 1999

*William H. Clendenen, Jr.*, with whom, on the brief, were *Nancy L. Walker* and *Thomas C. Pellegrino*, for the appellants (plaintiffs).

*Martin S. Echter*, deputy corporation counsel, with whom were *Roger J. Frechette* and, on the brief, *Franz P. Frechette*, for the appellee (defendant).

*Opinion*

PALMER, J. The plaintiffs, Richard and Donna Melillo, own a home in East Haven that is located several hundred feet north of Tweed-New Haven Airport (Tweed). They initiated this action against the defendant, the city of New Haven, which owns and operates Tweed, alleging that certain commercial jet flights into

and out of Tweed substantially interfered with the use and enjoyment of their property, thereby entitling them to compensation. After a court trial, the trial court rejected the plaintiffs' claims and rendered judgment in favor of the defendant. We affirm the judgment of the trial court.[1]

The record reveals the following relevant facts. In September, 1979, the plaintiffs purchased a home located at 177 Burr Street in East Haven for $60,000. The plaintiffs have resided at the 177 Burr Street residence since that date. The house, which is situated on a lot measuring 100 feet by 125 feet, was built in 1959, and is located approximately 450 feet north of the northern boundary of Tweed and less than 1500 feet from the end of the runway.[2] Aircraft using the runway fly almost directly over the plaintiffs' home.

Tweed, which straddles land located in both New Haven and East Haven, commenced operations in 1931. During two periods between 1967 and 1975, commercial jets flew in and out of Tweed. These flights gave rise to an action in the United States District Court for the District of Connecticut by the town of East Haven and owners of twelve homes located near Tweed. See generally *East Haven* v. *Eastern Airlines, Inc.*, 331 F. Sup. 16 (D. Conn. 1971), aff'd, 470 F.2d 148 (2d Cir. 1972), cert. denied, 411 U.S. 965, 93 S. Ct. 2144, 36 L. Ed. 2d 685 (1973) (*Eastern Airlines*). With respect to seven of these homes, the District Court found that the overflights had substantially interfered with the owners' use and enjoyment of their properties and, consequently, that the overflights constituted a compensable taking

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to what is now Practice Book § 65-1, and General Statutes § 51-199 (c).

[2] Tweed has two runways. Runway 2-20 runs north and south and runway 14-32 runs northwest and southeast. All references to the runway in this opinion are to runway 2-20.

under the fifth amendment to the United States constitution.[3] Id., 33. The plaintiffs' property, however, was not the subject of the litigation in *Eastern Airlines*.

From 1975 to 1984, there was no commercial jet service into or out of Tweed.[4] On November 10, 1984, however, Air Wisconsin conducted a test flight of a commercial jet. This jet, which flew directly over the plaintiffs' home, caused noticeable turbulence. Immediately after the test flight, the plaintiffs began a campaign to persuade the defendant to discontinue any further use of Tweed by Air Wisconsin jets.

Despite protests by the plaintiffs and other neighborhood residents, the defendant permitted Air Wisconsin to begin regularly scheduled jet flights into Tweed on February 15, 1985. These flights continued through December, 1986. Between March, 1985, and April, 1986, the peak period of Air Wisconsin jet service into Tweed, Air Wisconsin landed between 69 and 102 jets each month at Tweed. A substantial percentage of those jets flew directly over the plaintiffs' property, frequently at altitudes of less than 100 feet.[5]

Five days after Air Wisconsin had commenced its regularly scheduled jet service into Tweed, the plaintiffs

[3] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation." The takings clause of the fifth amendment is made applicable to the states through the fourteenth amendment. E.g., *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980).

[4] The trial court found, however, that when the plaintiffs purchased the property in 1979, "[t]here was . . . a substantial amount of nonjet flight . . . ." The evidence also indicated that corporate jets regularly used Tweed at that time.

[5] The evidence presented at trial indicated that, in addition to the Air Wisconsin overflights, there was some additional air traffic over the plaintiffs' property between 1984 and 1986 that, according to the plaintiffs, also impaired their use and enjoyment of their property. For ease of reference, we refer to all of the overflights during that period as Air Wisconsin overflights.

filed an action against the defendant, among others, in the United States District Court for the District of Connecticut. They claimed that the Air Wisconsin overflights had resulted in a taking of their property without just compensation in violation of the fifth amendment. In 1988, the District Court granted the defendant's motion for summary judgment, concluding that the plaintiffs' federal takings claim was not ripe under *Williamson Planning Commission* v. *Hamilton Bank*, 473 U.S. 172, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985), because the plaintiffs had not yet been denied just compensation under Connecticut law.[6] *Leach* v. *New Haven*, United States District Court, Docket No. N 85-71 TFGD (D. Conn. August 8, 1988) (Daly, J., slip opinion, pp. 5–6).

The plaintiffs then brought this action, claiming, inter alia, that: (1) the Air Wisconsin overflights had resulted in a permanent taking of their property by inverse condemnation[7] in violation of article first, § 11, of the constitution of Connecticut,[8] thereby entitling them to just compensation; and (2) they were entitled to compensation from the defendant under the federal Uniform Relocation Assistance and Real Property Acquisition

---

[6] In *Williamson Planning Commission* v. *Hamilton Bank*, supra, 473 U.S. 172, the United States Supreme Court held that "if a State provides an adequate procedure for seeking just compensation [for an alleged taking of private property], the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.*, 195.

[7] "Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. . . . Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. . . . *Agins* v. *Tiburon*, 447 U.S. 255, 258 n.2, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980)." (Citations omitted; internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 249 n.15, 662 A.2d 1179 (1995).

[8] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

Policies Act of 1970 (relocation assistance act), 42 U.S.C. § 4601 et seq.[9] With respect to their state constitutional takings claim, the plaintiffs alleged that their property had been the subject of a taking by virtue of the Air Wisconsin overflights from 1984 to 1986.[10] In support of their claim, the plaintiffs relied on the landmark case of *United States* v. *Causby*, 328 U.S. 256, 66 S. Ct. 1062, 90 L. Ed. 2d 1206 (1946), which established the federal standard for determining when an avigation easement[11] has been acquired by inverse condemnation.[12] In *Causby*, the United States Supreme Court

[9] The relocation assistance act provides that "[w]henever a program or project to be undertaken by a displacing agency will result in the displacement of any person, the head of the displacing agency shall provide for the payment to the displaced person of—

"(1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property . . . ." 42 U.S.C. § 4622 (a) (1) (1994).

The relocation assistance act defines the term "displaced person" as "any person who moves from real property, or moves his personal property from real property . . . ." 42 U.S.C. § 4601 (6) (A) (i) (1994).

[10] Of course, "[i]t is a fundamental principle of law that the power to appropriate private property for public use is an attribute of sovereignty and essential to the existence of government." (Internal quotation marks omitted.) *Bradley Facilities, Inc.* v. *Burns*, 209 Conn. 480, 490, 551 A.2d 746 (1988), cert. denied, 493 U.S. 810, 110 S. Ct. 54, 107 L. Ed. 2d 23 (1989). Nevertheless, the owner of such private property has a constitutional right to just compensation for any such appropriation.

[11] "An avigation easement is an easement of right to navigation in airspace over designated land." (Internal quotation marks omitted.) *Westchester* v. *Greenwich*, 227 Conn. 495, 497 n.1, 629 A.2d 1084 (1993). There are essentially two types of avigation easements: clearance easements and flight easements. "A clearance easement is acquired to assure that no structure exceeds a maximum height, if structures are allowed at all. This will give aircraft an unobstructed view and provide a safety margin for flights that may have to descend due to pilot error, poor weather conditions, etc. The flight easement allows the frequent overflight of aircraft over the encumbered land and constitutes a separate and distinct easement from the clearance easement." J. Eaton, Real Estate Valuation in Litigation (1982) pp. 256–57. Only the latter classification, established by *Causby*, is relevant to this case. For a general discussion of avigation easement law, see 4A J. Sackman, Nichols on Eminent Domain (3d Ed. Rev. 1998) § 14A.05, pp. 14A-116 through 14A-125.

[12] Neither party claims that the standard to be applied under article first, § 11, of the state constitution is any different from the standard applicable

essentially established a public highway in the air by declaring as outdated the ancient common-law doctrine that ownership of land extended to the periphery of the universe. Id., 260–61. At the same time, the court set limits on the uncompensated use of this public airspace. Flights below the minimum safe altitude of 500 feet, which had been prescribed by the Civil Aeronautics Authority, now the Federal Aviation Administration, fall outside. of the downward reach of the navigable airspace. Id., 263–64. Not all such flights, however, create compensable takings. "Flights over private land are not a taking, unless they are *so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.*"[13] (Emphasis added.) Id., 266.

After a trial, the court concluded that the plaintiffs had failed to prove their claims. The court's factual findings, which are set forth in its memorandum of decision, may be summarized as follows. The trial court concluded that the plaintiffs' property "was the subject of significant direct low altitude jet overflight from 1967 to 1975." The trial court also found that the "noise and turbulence [of the Air Wisconsin overflights from 1984 to 1986] substantially interfered with the [plaintiffs'] enjoyment of [their] property and caused some minor physical damage—such as loosened shingles—to the property,"[14] and that the "noise and turbulence [caused

under the takings clause of the fifth amendment to the United States constitution. Accordingly, for purposes of this case, we assume, without deciding, that article first, § 11, provides the same protection for property owners as that provided under the fifth amendment.

[13] Thus, in *Causby*, "the Court was called upon to weigh the conflicting interests (1) of the Government (and, by implication, of others) in connection with the need to use the air for the passage of aircraft, and (2) of the owners of subjacent lands in connection with the need for reasonable tranquility in the airspace overhead so that they may use and enjoy their property." *Lacey* v. *United States*, 595 F.2d 614, 615 (Ct. Cl. 1979).

[14] The trial court noted that "[t]he noise and turbulence of the Air Wisconsin flights cannot be calibrated exactly, at least upon the evidence in the

by the Air Wisconsin overflights] were roughly the same" as that caused by the jet overflights occurring between 1967 and 1975. Finally, the trial court stated that "[t]he evidence does not support a finding that the value of the [plaintiffs'] property was significantly altered by the Air Wisconsin [overflights]. The testimony of the plaintiffs' expert to the contrary—unsupported by any written report—was not credible. The value of the property has undoubtedly been lessened by virtue of the property's proximity to the airport, but that was the case in 1979 when the [plaintiffs] purchased it. To state the matter another way, I cannot find that the [plaintiffs] have sustained any significant economic damage as a result of the Air Wisconsin [overflights]."

On the basis of these factual findings, the trial court rendered the following legal conclusions. In light of the nature of the low altitude jet overflights from 1967 to 1975, the plaintiffs' property had been taken, for constitutional purposes, sometime during that time period, probably in 1967.[15] The trial court further concluded that, because the plaintiffs did not own the 177 Burr Street property at that time, they were not entitled to recover for that earlier taking.

The trial court, having determined that the plaintiffs' property had been taken sometime between 1967 and 1975, rejected the plaintiffs' claim that they were entitled to compensation for a permanent taking of their property based on the Air Wisconsin overflights.[16] The

record . . . [because no] actual measurements were submitted by the parties."

[15] In so concluding, the trial court expressly stated that its finding was based upon the evidence adduced at the trial of this case, not on the factual findings of the District Court in *Eastern Airlines*. As the trial court acknowledged, the findings of the court in *Eastern Airlines* are inapplicable to this case because the 177 Burr Street property was not the subject of that case.

[16] The trial court also stated that the taking that had resulted from the first series of jet overflights from 1967 to 1975, and the alleged taking that

court expressly noted that an earlier, permanent taking did not automatically bar the plaintiffs from establishing a second compensable permanent taking by virtue of the Air Wisconsin overflights. The court reasoned that it might have been possible for the plaintiffs to prevail on their claim of a compensable taking during the period from 1984 to 1986, notwithstanding the earlier taking, if the plaintiffs had been able to establish that the property had "been permanently 'taken' by moderate jet over-flights from 1967 to 1975 and then permanently 'taken' to an even greater extent by the substantially more severe [Air Wisconsin] overflights from 1984 to 1986." Because, however, the plaintiffs had not proven that the Air Wisconsin overflights were more disruptive to the enjoyment of property rights than the overflights from 1967 to 1975, the trial court concluded that the plaintiffs could not prevail under that theory.[17] Finally, the trial court rejected the plaintiffs' claim under the relocation assistance act because they had never moved from their home as a result of the Air Wisconsin over-flights and, consequently, were not "displaced persons" within the meaning of the relocation assistance act.[18] See footnote 9 of this opinion.

the plaintiffs claimed had resulted from the second series of overflights from 1984 to 1986, each might be considered a "temporary," rather than a "permanent," taking. Under such a theory, the court noted, the plaintiffs conceivably would be entitled to some compensation from the defendant for the "temporary" taking arising from the Air Wisconsin overflights. The trial court explained, however, that the plaintiffs had "unambiguously declined to pursue such a claim," arguing, instead, that the Air Wisconsin overflights had resulted in a *permanent* taking of their property.

[17] In setting forth this theory, the trial court adverted to certain language from the opinion of the Second Circuit Court of Appeals in *Eastern Airlines* that, the trial court suggested, left open the possibility that such a fact pattern could support a federal constitutional takings claim. See *East Haven* v. *Eastern Airlines, Inc.*, 470 F.2d 148, 151 (2d Cir. 1972), cert. denied, 411 U.S. 965, 93 S. Ct. 2144, 36 L. Ed. 2d 685 (1973).

[18] The plaintiffs also claimed that: (1) they are entitled to compensation under the takings clause of the fifth amendment; and (2) the defendant owed them compensation under General Statutes § 13b-43, which provides in relevant part that "[a]ny municipality . . . may expand or improve an airport, and may take any land or interest therein necessary for such expan-

On appeal,[19] the plaintiffs argue that, contrary to the conclusion of the trial court, the evidence established that the Air Wisconsin overflights rendered the 177 Burr Street property "unfit for human habitation" and, therefore, resulted in a permanent taking of their property under article first, § 11, of the constitution of Connecticut, for which they claim compensation for the full value of their property.[20] The plaintiffs contend that the trial court, in rejecting their claim, relied on unsupported factual findings and faulty legal conclusions. In particular, the plaintiffs claim that the record does not support the trial court's determination that the jet flights over 177 Burr Street from 1967 to 1975 gave rise to a

sion or improvement . . . upon paying just compensation to the owner of such land or interest therein. . . ." With respect to the plaintiffs' federal constitutional claim, the trial court concluded that the plaintiffs were not entitled to consideration of that claim because article first, § 11, of the state constitution provides them with an adequate procedure for obtaining just compensation for the alleged taking of their property. See footnote 6 of this opinion. The trial court further held that, even if the plaintiffs were entitled to raise a federal constitutional claim, they could not prevail on that claim for the same reasons that the court had rejected their state constitutional claim. Finally, the trial court rejected the plaintiffs claim under § 13b-43 because the plaintiffs had adduced no evidence to establish that the defendant had expanded or improved Tweed in such a manner as to affect the plaintiffs' property.

[19] After the trial court had issued its memorandum of decision on July 11, 1997, the plaintiffs filed a motion for articulation, which the trial court denied on September 15, 1997. The plaintiffs then filed a motion for review with the Appellate Court. On September 22, 1997, the Appellate Court, in a one page order, granted the plaintiffs' motion for review, but denied the relief sought.

[20] In the trial court and in their briefs on appeal, the plaintiffs consistently have asserted, with respect to the issue of just compensation, that the defendant should be required to purchase the 177 Burr Street property from them. At oral argument, however, the plaintiffs conceded that, because the property retains significant market value notwithstanding the Air Wisconsin overflights, the defendant would not necessarily be required to compensate them in an amount equal to the full value of the property. We know of no support for the plaintiffs' claim that a taking of the kind they allege would entitle them to compensation for the full value of their property absent a showing that, due to the Air Wisconsin overflights, their property was essentially without value.

constitutional taking at that time. The plaintiffs further contend that, in light of this unsupported finding, the trial court improperly required the plaintiffs to show, as a predicate to their claim that the 177 Burr Street property had been taken as a result of the Air Wisconsin flights, that those overflights gave rise to substantially more severe interference with the use and enjoyment of the property than had the earlier series of jet flights from 1967 to 1975. The plaintiffs also assert that the trial court's finding that they had failed to prove economic damage to their property as a result of the Air Wisconsin overflights was clearly erroneous. Finally, the plaintiffs contend that they are entitled to compensation under the relocation assistance act.

With respect to the plaintiffs' constitutional takings claim, we agree with the plaintiffs that the record does not support the trial court's conclusion that the jet overflights between 1967 and 1975 had resulted in a taking of the 177 Burr Street property at some time during that time period. Our careful review of the record reveals that, although the plaintiffs presented some evidence regarding the flights into and out of Tweed from 1967 to 1975, no evidence was introduced to establish the extent to which those flights had interfered with the use and enjoyment of the 177 Burr Street property *in particular*. Moreover, as the trial court observed, the District Court's findings in *Eastern Airlines* are not applicable to this case because the status of the 177 Burr Street property was not litigated in *Eastern Airlines*.[21] See footnote 15 of this opinion.

The determination of whether a particular property has been taken by inverse condemnation must be made

---

[21] Moreover, the District Court in *Eastern Airlines* found that only seven of the twelve subject properties at issue in that case had been taken by virtue of the jet overflights between 1967 and 1975, and, even with respect to those seven, the court characterized its determination as a "close" call. *East Haven* v. *Eastern Airlines, Inc.*, supra, 331 F. Sup. 33.

on the specific facts of the individual case. See, e.g., *Persyn* v. *United States*, 34 Fed. Cl. 187, 196 (1995). "The answer to the question of when a takings claim has accrued requires the court to consider each element as it relates to the unique facts of a particular case. . . . Avigation easement claims cannot be tried on a 'one size fits all' formula. Each element must be established for each parcel, and evidence of a taking over one parcel in a case does not, without more, support a finding of a taking over other parcels." (Citation omitted.) Id. Although the evidence adduced at trial, in combination with the findings of the District Court in *Eastern Airlines*, may *suggest* that the 177 Burr Street property had been the subject of a compensable taking sometime between 1967 and 1975, the evidence regarding the overflights during that time period was insufficient to establish such a taking.

The trial court, having found that a taking of the 177 Burr Street property had occurred between 1967 and 1975, rejected the plaintiffs' claim of a taking between 1984 and 1986 because the evidence did not establish that the later series of overflights gave rise to a greater degree of interference with the use and enjoyment of the property than had the earlier series of overflights. In light of our determination that the trial court improperly concluded that the property had been the subject of a taking between 1967 and 1975, the court's rejection of the plaintiffs' takings claim, predicated on its unsupported finding of a prior taking, necessarily also was improper. Furthermore, we agree with the plaintiffs that the trial court's finding that the "noise and turbulence [of the Air Wisconsin flights between 1984 and 1986] substantially interfered with the [plaintiffs'] enjoyment of the property," a finding that *was* amply supported by the evidence, sufficed to establish that the plaintiffs had satisfied the *Causby* test for proving the taking of an avigation easement.

Nevertheless, we conclude that the trial court's finding that the plaintiffs failed to meet their burden of proving economic harm to the 177 Burr Street property as a consequence of the Air Wisconsin overflights was not clearly erroneous. Absent such proof, the plaintiffs cannot prevail on their claim of a *compensable* taking.

At trial, each party adduced testimony from a real estate appraiser to support its claim regarding the value of the 177 Burr Street property before and after the Air Wisconsin overflights. Furthermore, both experts relied on the comparable sales approach to estimate the fair market value of the property before and after the Air Wisconsin overflights.[22] The plaintiffs' expert, Richard Michaud, opined that, on the basis of his analysis of the sale of properties in the vicinity of Tweed during the relevant time period, the 177 Burr Street property had decreased in value from $90,500 in November, 1984, prior to the Air Wisconsin flights, to $59,000 in February, 1985. According to Michaud, the property had increased in value to $105,000 as of the time of trial in 1997. Michaud also testified that, in light of his review of the sale of properties in East Haven, New Haven and seventeen surrounding towns, the 177 Burr Street property had appreciated in value at a significantly lower rate than those other properties in East Haven and New Haven that were not subject to direct jet overflights.

The defendant's expert, John Leary, testified that jet flights into and out of Tweed between 1971 and 1986 had no discernable impact on the value of residential properties that were the subject of jet overflights. Leary based his conclusion on an analysis of 700 residential sales in New Haven and East Haven, including the area

---

[22] The comparable sales approach has long been an approved method for ascertaining the fair market value of property. See, e.g., *Torres* v. *Waterbury*, 249 Conn. 110, 123–24, 733 A.2d 817 (1999); *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 385–86, 389 A.2d 734 (1978); *Hutensky* v. *Avon*, 163 Conn. 433, 437, 311 A.2d 92 (1972).

immediately surrounding Tweed. On the basis of the sales data he analyzed, Leary testified that properties in the flight zone showed an average annual percentage increase in value in the middle range of the overall market. According to Leary, this finding refuted the plaintiffs' claim that the value of their property had decreased as a result of the Air Wisconsin overflights.

The trial court credited the testimony of the defendant's expert witness, Leary, and expressly discredited the conclusions of the plaintiffs' expert, Michaud. "The determination of [property] value by a court is the expression of the court's opinion aided ordinarily by the opinions of expert witnesses . . . . [T]he determination of the credibility of expert witnesses and the weight to be accorded their testimony is within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." (Citations omitted; internal quotation marks omitted.) *Eichman* v. *J & J Building Co.*, 216 Conn. 443, 451–52, 582 A.2d 182 (1990). "[I]t is the proper function of the court to give credence to one expert over the other." *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 100, 626 A.2d 1292 (1993). "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997).

The record amply supports the trial court's conclusion regarding the relative credibility of the two experts.

Michaud had limited experience in residential appraisal in the New Haven-East Haven area. By contrast, Leary, whose professional credentials were superior to those of Michaud,[23] had done extensive residential appraisal work in that locale. It is noteworthy, moreover, that Michaud did not prepare a written report of his findings, whereas Leary did. In addition, Michaud testified that, in determining the value of the 177 Burr Street property, he had not limited himself to comparable sales data, but, instead, had used several other valuation tools, which, he maintained, enhanced the reliability of his analysis of the market data.[24] Leary, on the other hand, did not rely on such factors in reaching his conclusion, but, rather, based his valuation of the property solely on the comparable sales figures.[25] Finally, Leary limited his market study to properties located within an area that the trial court reasonably could have deemed to be the most relevant one, namely, New Haven and East Haven. Michaud, by contrast, relied, at least in part, on

[23] For example, Leary had been engaged in the appraisal of real estate since 1970, whereas Michaud had been an appraiser only since 1986. Furthermore, Leary had taught a number of courses, including college level courses, on the appraisal of real property; Michaud apparently had no such experience.

[24] For example, Michaud stated that he had relied on his own inspection of the 177 Burr Street property, and his perception of how certain overflights during his visit to the property were likely to have "affected those [properties] directly in the flight path, and how they affected those directly to the left or right of the flight path . . . ." Michaud also stated that he had relied on his "experience with other forms of nuances or externalities, such as overhead power lines, such as a change in use by a neighbor [and] how that affects the specific property. You know, we look at a number of things because real estate markets are relatively inefficient [in that they do not provide] clear and conclusive evidence [of value]."

[25] In noting Michaud's consideration of factors other than the comparable sales figures, we do not mean to imply that an appraiser's reliance on such factors necessarily would render that expert's opinion unreliable. We point them out, rather, only because the trial court reasonably could have concluded that, in the circumstances of this case, there was no sound basis for Michaud to have relied on them, and, furthermore, that the relatively subjective nature of those factors casts doubt on the trustworthiness of Michaud's market analysis.

comparative sales data for an area covering seventeen towns spanning from Bethany to Madison. Thus, the trial court reasonably could have determined, on the basis of the two experts' testimony, that Leary's valuation of the 177 Burr Street property was predicated upon a more comprehensive knowledge of the relevant market than Michaud's valuation.

The plaintiffs have provided no persuasive reason why Leary's opinion regarding the economic impact of the Air Wisconsin overflights on the plaintiffs' property, which was based upon the same valuation method—the comparable sales approach—as that employed by Michaud, was flawed or otherwise untrustworthy. In essence, therefore, "the plaintiffs' argument is that the court chose not to believe their appraiser. Nothing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. . . . The purpose of offering in evidence the opinions of experts as to the value of land is to aid the trier to arrive at his [or her] own conclusion, which is to be reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value and his [or her] own general knowledge of the elements going to establish it. . . . Ultimately, the determination of the value of the land depended on the considered judgment of the [trial court], taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties." (Citations omitted; internal quotation marks omitted.) *Maykut* v. *Shugrue*, 171 Conn. 286, 288, 370 A.2d 923 (1976).

It is possible, of course, that another expert might have succeeded where the plaintiffs' expert failed. It is far more likely, however, that, by the time the plaintiffs had purchased their home in 1979, the market already had adjusted for the likelihood of interference from jet flights into and out of Tweed. In other words, any

diminution in the value of the 177 Burr Street property may have been reflected in the price that the plaintiffs had paid for the property when they purchased it in 1979, after the first series of jet overflights from 1967 to 1975. In any event, the trial court reasonably concluded that the plaintiffs failed to prove that the Air Wisconsin overflights had adversely affected the value of the 177 Burr Street property.[26]

Finally, the trial court also properly rejected the plaintiffs' claim under the relocation assistance act. See 42 U.S.C. §§ 4601 (6) (A) (i) and 4622 (a) (1). The plaintiffs are not "displaced persons" within the meaning of the relocation assistance act because they had never moved, or moved their personal property, from 177 Burr Street. See footnote 9 of this opinion. Consequently, they do not fall within the class of persons entitled to compensation under that act.[27] Accordingly, the plaintiffs' claim under the relocation assistance act is without merit.[28]

---

[26] In their briefs, the plaintiffs also assert, in conclusory fashion, that the "trial [court's erroneous conclusion] that the plaintiffs' property was previously taken in 1967, and that there was no substantial variation between the [defendant's] activities [between] 1967 [and 1975] and its activities [between] 1984 [and 1986] . . . adversely affected [the court's] evaluation of the economic effect of the 1984 taking." The plaintiffs, however, have provided no support for this assertion, and we are aware of none. Indeed, the findings about which the plaintiffs complain relate to the question of whether an avigation easement had been acquired by the defendant by virtue of one or both of the two series of overflights, not to the issue of whether the later series of overflights had resulted in economic harm to the property.

[27] We note that the plaintiffs, in their complaint, alleged that the defendant had "agreed to abide by the terms and conditions" of the relocation assistance act, and the regulations promulgated thereunder, as a condition of the receipt of "substantial aid and assistance from the United States to operate Tweed . . . ." The trial court did not address this issue in light of its conclusion that the plaintiffs were not "displaced persons" within the meaning of the relocation assistance act. We also need not address this issue.

[28] The plaintiffs also have appealed from the judgment of the trial court rejecting their claim under the takings clause of the fifth amendment. See footnote 18 of this opinion. We agree with the trial court that the plaintiffs are not entitled to consideration of that claim because of the existence of a legally sufficient procedure, under article first, § 11, of the constitution

The judgment is affirmed.

In this opinion the other justices concurred.

of Connecticut, to obtain just compensation for the alleged taking of their property. Moreover, even if the plaintiffs were entitled to bring a federal constitutional claim, they cannot prevail on that claim for the same reasons that we have rejected their state constitutional claim. Finally, the plaintiffs have not appealed from the judgment of the trial court rejecting their claim under General Statutes § 13b-43. See footnote 18 of this opinion.