## DE LA CONCHA OF HARTFORD, INC. *v.* AETNA LIFE INSURANCE COMPANY
## (SC 16989)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued October 21, 2003—officially released June 1, 2004

*Marc E. Kasowitz,* pro hac vice, with whom were *Shaddy W.F. Kessing* and *Howard L. Bressler,* pro hac vice, for the appellant (plaintiff).

*Paul D. Wilson,* pro hac vice, with whom were *Pamela M. Chambers* and, on the brief, *Samuel F. Davenport,* pro hac vice, for the appellee (defendant).

*Opinion*

PALMER, J. This appeal arises out of a dispute between the plaintiff, De La Concha of Hartford, Inc., the lessee of certain retail space in the Hartford Civic Center (Civic Center), and the defendant, Aetna Life Insurance Company, the former owner of the Civic Cen-

ter and lessor of the space leased by the plaintiff. The plaintiff commenced this action alleging, inter alia, that the defendant had breached the implied covenant of good faith and fair dealing and had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by changing its leasing and promotional practices at the Civic Center during the plaintiff's tenancy and by refusing to renew the plaintiff's lease. After a court trial, the court rejected the plaintiff's claims as factually unfounded and rendered judgment for the defendant. On appeal,[1] the plaintiff's sole claim is that the trial court's findings are unsupported by the evidence. We disagree and, therefore, affirm the judgment of the trial court.[2]

The trial court's memorandum of decision sets forth the following relevant facts. "The [Civic Center] . . . in downtown Hartford is an enclosed mall with retail stores facing inward toward a central court and generally not visible from the street. The facility also contains a coliseum used for events and exhibitions, and an arena for sporting contests. Customers are attracted to the Civic Center by the direct advertising of retailers, by promotion of the Civic Center as a downtown shopping mall and by events at the coliseum and sports arena.

[1] The plaintiff appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The plaintiff also asserted claims for breach of contract, promissory estoppel, tortious interference with business expectancies and negligent misrepresentation. With respect to the plaintiff's claims of breach of contract, promissory estoppel and tortious interference with business expectancies, the plaintiff failed to address them in its posttrial brief and the trial court deemed them abandoned. With respect to the plaintiff's negligent misrepresentation claim, the trial court concluded that the plaintiff had not established that claim. The plaintiff has not appealed from that part of the trial court's judgment concerning those four claims. This appeal, therefore, is limited to the trial court's rejection of the plaintiff's CUTPA claim and the plaintiff's claim regarding the defendant's alleged breach of the implied covenant of good faith and fair dealing.

Interdependency of the retailers is particularly important. Consumers [who come] to the Civic Center to make an intended purchase at one store frequently make an impulse purchase at another store. On the one hand, full occupancy of the Civic Center helps all the retailers to prosper. On the other hand, low occupancy [gives] the Civic Center a deserted feeling that depresses the sales of the remaining retailers.

"[The plaintiff] was a retail distributor of tobacco and tobacco related products. The defendant . . . [was] the owner and lessor of the Civic Center. In 1975, [the plaintiff] entered into a fifteen year lease with . . . [the defendant's predecessor][3] for retail space in the Civic Center. The lease was renewed in 1990 and 1995, and expired by its terms in September, 2000.

"The lease provided for an annual rental of $6502 the first year, $9625 the second and third years, and $13,125 the fourth through the fifteenth years, plus a percentage rental of 5 percent of gross sales. The lease further required [the plaintiff] to contribute $18.23 a month to a promotional fund, to which other tenants contributed amounts based on the square footage of their stores. [The defendant] agreed to contribute not less than 25 percent of the total amount of funds paid by the [retail] tenants of the . . . [Civic Center] . . . . However . . . at its option [the defendant could] contribute all or part of the services of a promotion director and/or secretary or [could] provide reasonable office space and equipment in lieu of the cash contributions.

"[The plaintiff's] lease was amended as of January 1, 1980, to provide that the percentage rent would be 5 percent of gross sales in excess of $262,500 each year

---

[3] The original lessor of the space leased by the plaintiff was Aetna Life and Casualty Company, the defendant's predecessor. At all times relevant to this appeal, however, the defendant was the owner and lessor of the premises leased by the plaintiff.

and that [the defendant] could terminate the lease if [the] plaintiff's gross sales were less than $400,000 in one year. The lease was amended in 1990 to extend its terms to September 30, 1999, and to change the percentage rent to 5 percent of the gross sales, exclusive of cigarette sales, exceeding $262,500. It further gave [the] plaintiff the option to extend the term of the lease for two additional five year terms provided [the] plaintiff was not in default and its gross sales in the last year prior to the date of exercise of the option totaled at least $262,500. [The plaintiff] exercised its option to renew in March, 1995, and the lease was renewed for five more years to terminate on September 30, 2000, with a slight increase in rent and a slight change in the percentage rent provision.

"[The plaintiff's] lease did not [contain], as the leases of other tenants did, a clause tying [the plaintiff's] tenancy either to a prescribed occupancy rate of the Civic Center or to a key tenant remaining at the Civic Center.

"The Civic Center opened in 1975. It was essentially fully occupied. However, [the defendant] was never able to find an anchor tenant. As a consequence, it created [Luettgens Ltd.] as an upscale department store, which, during the entire time of its existence, lost money and required subsidization by [the defendant]. In subsequent years, the Civic Center's occupancy rate fluctuated with the Hartford economy. In the early 1980s, when the Hartford economy contracted, the occupancy rate dropped to between [50 and 75 percent]; in the mid and late 1980s, when the Hartford economy rebounded, the occupancy rate rose to 90 percent. When the Hartford economy [became] depressed again in the early 1990s, the occupancy rate again started dropping. Yet, even when fully occupied, [the defendant] lost money as the owner of the Civic Center.

"For many years, [the defendant] spent enormous amounts of its own money to make the Civic Center a

viable business venture. It felt its reputation as a leading Hartford company and important Hartford citizen was at stake. From 1992 to 1998, [the defendant] contributed many times more to the promotional fund than it was obligated to [contribute] under the lease.

"In the mid 1990s, a number of factors contributed to the falling occupancy at the Civic Center and the difficulty [the defendant] had acquiring new tenants: (1) [a] number of Hartford companies laid off downtown employees, reducing the source of customers for the Civic Center; (2) [n]ew shopping centers expanded, upgraded or opened in the suburbs, including Westfarms Mall, West Hartford center, and Buckland Hills; (3) [t]he [Civic Center] coliseum lost out in ticket sales to the Meadows Music Theater in . . . Hartford; (4) [t]he Hartford Whalers [ice hockey franchise], the biggest sports draw in Hartford, left in 1997; [and] (5) [d]owntown Hartford retail establishments such as G. Fox and Sage Allen closed their doors, leaving little to attract customers to downtown Hartford.

"Although [the defendant] tried to buck the trend, its efforts at promotion did not increase traffic, obtain new tenants or acquire tenant replacements at the Civic Center.

"In 1995, David Romano became [the defendant's asset] manager for the Civic Center. When he analyzed the financial outlook, he found the Civic Center had lost more than $50 million in twenty years, had few substantial tenants and was hemorrhaging thousands of dollars for lack of rental income and high operating expenses. [Romano] explored the possibilities of [the defendant's] closing the Civic Center, selling it or finding a partner able to run it profitably. His analysis revealed that, by closing the Civic Center, [the defendant] would lose [approximately $5 million] in rents and still incur nondiscretionary operating expenses of

[more than $1 million]. By keeping it open, [the defendant could expect] annual operating losses of [approximately $500,000 but would avoid] expensive tenant lease buyouts of between [$4 and $5 million].

"Because [Romano] deemed [the sale of] the Civic Center as the most likely alternative, but . . . could not foresee what use the potential purchaser might make of the [Civic] [C]enter, he undertook a policy of entering into short-term leases or [leases] giving [the defendant] the right to recapture the premises in order to make the Civic Center more saleable. That policy, however, seemed to have little impact on acquiring new tenants, and some of the existing tenants actually insisted on year-to-year leases or early termination dates before renewing. In 1995, [the defendant] essentially terminated its efforts to promote the Civic Center and substantially cut its promotion budget. It stopped [television], radio, and newspaper advertising and promotional events [at the Civic Center]. It also stopped requiring tenants to contribute to the Civic Center marketing fund.

"This lack of promotion, however, had little effect on tenant sales. In fact, in . . . December, 1998, the Civic Center retailers reported a 5.5 percent increase in sales, and in the period from May, 1998, to May, 1999, a 1.5 percent increase in sales.

"At the same time, from 1992 to 1997, the cigar industry experienced its biggest boom. In 1997, [the plaintiff's] sales peaked at $550,027, over 70 percent higher than they had been just five years earlier.

"In fiscal year 1998, [the defendant] collected $80,470 in tenant contributions to the Civic Center marketing fund and spent $66,700 for direct advertising and promotion of the Civic Center. For fiscal year 1999, the [Civic Center] tenants contributed $29,179 and [the defendant] spent less than $12,000 in direct promotion.

In those years, [the defendant] limited its capital expenditures to safety measures and maintaining the physical integrity of the premises.

"In 1997, [the defendant] finally decided to sell the Civic Center. [The defendant nevertheless] incurred indirect promotion expenses [in order to avoid violating] the terms of the lease[s]. [The defendant] sent out promotional material to potential buyers and notified its tenants. The first potential purchaser, the Hutensky Group, was rejected by the city of Hartford. Finally, in 1999, [the defendant] agreed to sell the Civic Center to Northland, Inc., for development into a high rise residential complex with some retail stores.

"[The plaintiff] continued in business but the cigar [boom was over] in 1998. In 1999, [the plaintiff's] sales dropped from $401,120 to $283,535. [The plaintiff] also started to default in its rent. Despite [a] reduction in sales, in 2000, however, [the plaintiff] sought to exercise its option to renew its lease for another five years. [The plaintiff] was then behind in [paying rent] and had failed to maintain its annual sales of at least $262,500 . . . [a condition] for renewal [of] the lease. [The defendant] rejected [the] plaintiff's option to renew. [The plaintiff closed its business on March 17, 2001.]"[4] (Internal quotation marks omitted.) Additional facts will be set forth as necessary.

The plaintiff contends that the factual findings upon which the trial court relied in rejecting the plaintiff's claims are clearly erroneous.[5] Our review of the plaintiff's contention is therefore limited. "It is well estab-

---

[4] The trial court stated in its memorandum of decision that the plaintiff commenced this action shortly after it closed its business. In fact, the plaintiff commenced this action in May, 1998, nearly three years before it ceased operations.

[5] Whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review. E.g., *Strouth* v. *Pools by Murphy & Sons, Inc.*, 79 Conn. App. 55, 59, 829 A.2d 102 (2003).

lished that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 123, 733 A.2d 817 (1999). We afford great weight to the trial court's findings because of its function to weigh the evidence and determine credibility. E.g., *Drabik* v. *East Lyme*, 234 Conn. 390, 394–95, 662 A.2d 118 (1995). Thus, those "findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Melillo* v. *New Haven*, 249 Conn. 138, 151, 732 A.2d 133 (1999).

We turn now to the legal principles governing each of the plaintiff's two claims. With respect to the plaintiff's allegation that the defendant breached the implied covenant of good faith and fair dealing, "[i]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 566, 479 A.2d 781 (1984); see also 2 Restatement (Second), Contracts § 205 [1981] ([e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement)." (Internal quotation marks omitted.) *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000). In other words, every contract carries an implied duty "requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation

marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 564, 733 A.2d 197 (1999) (*Callahan, C. J.*, dissenting). "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 617, 830 A.2d 164 (2003).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Alexandru* v. *Strong*, 81 Conn. App. 68, 80–81, 837 A.2d 875, cert. denied, 268 Conn. 906, 845 A.2d 406 (2004), citing *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 598, 687 A.2d 111 (1996). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *Habetz* v. *Condon*, 224 Conn. 231, 237, 618 A.2d 501 (1992).

With respect to the plaintiff's CUTPA claim, "Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it

causes substantial injury to consumers (or competitors or other businessmen). . . . Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Whether a practice is unfair and thus violates CUTPA is an issue of fact. . . . The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court." (Citations omitted; internal quotation marks omitted.) *Ancona* v. *Manafort Bros., Inc.*, 56 Conn. App. 701, 714–15, 746 A.2d 184, cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000).

With these legal principles in mind, we consider first the plaintiff's contention that the trial court improperly rejected its claim that the defendant breached the implied covenant of good faith and fair dealing. At trial, the plaintiff maintained that, because the economic viability of any one retail tenant of an enclosed mall, such as the Civic Center, depends upon the occupancy rate of the entire mall, the defendant had an obligation, implied under its lease, to make good faith efforts to promote and to maintain the mall. In support of this contention, the plaintiff relies on two provisions in the lease: the gross sales provision, which afforded the plaintiff the right to renew its lease provided its gross sales exceeded $262,500, and the promotional fund provision, which required the defendant to contribute not less than 25 percent of the total amount that the Civic Center tenants had paid into the promotional fund. According to the plaintiff, the gross sales provision of the lease impliedly obligated the defendant to refrain from conduct that created any unfair or unnecessary risk of adversely affecting the plaintiff's sales. The plaintiff further claimed that the promotional fund provision gave rise to a duty on the part of the defendant to make reasonable efforts to promote and to maintain the Civic Center for the purpose of achieving an occupancy rate

that was consistent with the economic well-being of the tenants, including the plaintiff.

The plaintiff asserted that the defendant failed to meet its obligation to promote the Civic Center and to make reasonable efforts to maintain the occupancy rate at an acceptable level. In particular, the plaintiff claimed that the evidence established, as a matter of law, that the defendant, once it had decided to sell the Civic Center, engaged in a "scheme" or course of conduct to "starve out" the plaintiff and other tenants so as to make the Civic Center more appealing to potential purchasers who, in the absence of tenants, would have greater flexibility in deciding how to maximize profitability.[6] The plaintiff asserted that, in furtherance of this strategy, the defendant, beginning in or around 1995, elected not to promote or to market the Civic Center and, in addition, declined to enter into new leases or lease renewals on terms that would be attractive to existing or prospective tenants. In support of the latter claim, the plaintiff pointed to the defendant's decision to enter into short-term leases and lease renewals only, and to require a provision in each such lease permitting the defendant to "recapture," or terminate, the lease on relatively short notice.[7] In the plaintiff's view, these recapture provisions were likely to increase vacancies at the Civic Center.

Finally, the plaintiff challenged the propriety of the defendant's refusal to renew the plaintiff's lease in 2000 on the ground that the plaintiff had failed to attain gross annual sales of $262,500. Specifically, the plaintiff

---

[6] We note that the plaintiff did not claim that the sale of the Civic Center was barred either by the lease terms themselves or by the lease's implied covenant of good faith and fair dealing. The plaintiff asserted, rather, that the policies implemented by the defendant in preparation of the sale were improper.

[7] The recapture provisions generally allowed the defendant to terminate the lease upon notice to the tenant of between thirty and ninety days.

claimed that the defendant's rejection of the plaintiff's option to renew was unreasonable and in violation of the lease's implied covenant of good faith and fair dealing because the plaintiff's failure to reach gross sales of $262,500 was due in large part to the defendant's failure to promote the Civic Center as required under the lease.

In rejecting the plaintiff's claims, the trial court found that the defendant had not breached any express term of the lease nor had it engaged in any conduct prohibited by the lease's implied covenant of good faith and fair dealing. In particular, the court found that, although the defendant had an obligation to conduct itself in conformity with the express lease provisions and with the plaintiff's justified expectations in light of those provisions, the defendant's conduct had satisfied that standard. In this regard, the trial court noted: "The Civic Center was an economic venture in which [the defendant] was engaged . . . not only as a good citizen of Hartford but also to make a profit. Clearly, [the defendant's] reasonable expectations did not include continuing to promote the Civic Center when it was losing hundreds of thousands of dollars every year. Nor did it assume an obligation as a guarantor of the plaintiff's prosperity. . . .

"Here, [the defendant] acted reasonably to cut its losses arising from the operation of the Civic Center in light of the departure of the [Hartford] Whalers, the expansion of shopping malls in the suburbs and the deteriorating economic situation in downtown Hartford."

With regard to the promotional fund provision of the lease, the court found that the defendant had contributed substantially more to promoting and marketing the Civic Center than that required under the lease. The court further found that even if the defendant had failed,

at some point during the plaintiff's tenancy,[8] to meet its responsibility under the lease to promote the Civic Center, any such failure would have had "no effect" on the plaintiff's financial condition because, by that time, "no matter how much the [defendant] had expended on promoting the [Civic] [C]enter, [any such expenditure] would not have made the slightest . . . difference in [the maintenance and acquisition of] new tenants or in . . . the economic viability of the [Civic] [C]enter."

The trial court also found that the plaintiff had failed to establish that the defendant acted in bad faith at any time. In particular, the trial court concluded that, although the defendant had "pursued its own self-interest in limiting its losses in the operation of the Civic Center . . . it did not do so because of a dishonest purpose, a furtive design or ill will toward the plaintiff."

Finally, the trial court rejected the plaintiff's claim that the defendant had violated the lease's implied covenant of good faith and fair dealing by refusing to renew the plaintiff's lease. The court concluded that the defendant had acted reasonably and within its rights under the lease in rejecting the plaintiff's option to renew because the plaintiff, having failed to pay rent for the several months preceding its renewal request, was in default and, therefore, not entitled to the renewal that it had sought.

To the extent that the plaintiff contends that the defendant was obligated to conduct itself in good faith

---

[8] In this regard, the plaintiff refers to evidence that, in the latter years of the lease, the defendant did not expend the full amount of the promotional fund on marketing and promoting the Civic Center. The trial court found, however, and the evidence indicates, that the defendant never breached its obligation under the lease to promote the Civic Center because the expenditures that it made in the discharge of that obligation, whether derived directly from the promotional fund or otherwise, always met, and generally exceeded, the requirement for such expenditures under the provisions of the lease.

and in a manner consistent with the reasonable expectations of the parties in view of the provisions of the lease, we agree with that contention. Although the actual lease terms provide the most significant guidepost in determining the parties' reasonable expectations, it is also true, as the plaintiff asserts, that the defendant was prohibited, under the lease's implied covenant of good faith and fair dealing, from engaging in purposeful conduct that is inimical to the material terms of the lease. We conclude, however, that the trial court's determination that the evidence did not support the plaintiff's allegations of such conduct is amply supported by the record.

As we have indicated, the thrust of the plaintiff's claim was that, once the defendant had decided to sell the Civic Center, it took steps to "starve out" the tenants to make the Civic Center more marketable. Contrary to the plaintiff's claim, the evidence supported the trial court's finding that the defendant's decision to sell the Civic Center and the steps it took to implement that decision were undertaken reasonably and in good faith, and for the purpose of extricating itself from a well-intended but unsuccessful business venture that resulted in the defendant's loss of more than $50 million over the course of approximately twenty years. In particular, the evidence established that the defendant went to considerable lengths to *retain* existing tenants and to attract new ones; indeed, the defendant offered certain tenants substantial rent reductions to induce them to renew their leases. With respect to the defendant's decision to enter into short-term leases with recapture provisions, a number of tenants or potential tenants *themselves* insisted on such terms in light of the precarious state of the Hartford economy.[9] For

---

[9] In fact, Anthony G. Breault, an employee of Jones Lang LaSalle Americas, Inc., a company retained by the defendant to provide management services for the Civic Center, testified that, to his knowledge, for the period from 1995 until the sale of the Civic Center by the defendant, no prospective or

example, one tenant, Successories of Connecticut, Inc., sought the right to terminate its lease upon sixty days' notice;[10] T.J. Maxx, a principal tenant of the Civic Center mall, threatened to exercise its lease termination option and to leave the Civic Center unless the defendant agreed to a year-to-year tenancy; and Pizzeria Uno, a potential tenant concerned about the possible departure of the Hartford Whalers, indicated that it would not lease space in the Civic Center unless it was afforded a right of early termination. Thus, as Romano, the Civic Center's asset manager, explained: "There was no desire on my part to empty out the [Civic Center] mall because we didn't know if a full mall or an empty mall would be desirable to a buyer because, again . . . we didn't know what the end game was, so it didn't make sense to empty out the mall, nor did it make sense to fill it up with a lot of long-term lease obligations. What made sense was to have it be flexible so that it [could] take on a life it needed to take on."

Moreover, some existing tenants simply refused to renew their leases, not because of the terms offered by the defendant but, rather, because of the bleak retail climate in downtown Hartford. In light of the weak economy, it also was difficult, if not impossible, for the defendant to attract new tenants to the Civic Center. As Romano testified: "It was very hard to attract retail tenants to downtown Hartford because of the general economic nature of downtown Hartford. Again, it had suffered through serious job loss from [the late 1980s to the mid 1990s]. Retail had left downtown. You had expanded retail options in the suburbs, which were the new shopping areas of choice, and so it was difficult

existing tenant declined to enter into a lease or to renew a lease because the lease contained a recapture provision.

[10] Specifically, the terms of the proposed lease purported to give both the defendant and Successories of Connecticut, Inc., the right to terminate the lease upon sixty days' notice.

to get retailers even interested to even look at leasing space in the Civic Center mall, and if [you have] them entertaining a discussion with you, the discussion of the economics of what it would take to have them open up in the mall and whether or not you could make any money off of that . . . it was just hard to make the numbers work for both sides."

The trial court reasonably concluded, moreover, that the defendant's conduct subsequent to its decision to sell the Civic Center, including its efforts to minimize operating losses by eliminating direct expenditures for promotional activities, had no material bearing on the plaintiff's gross sales. As the evidence indicated and the trial court found, the weak Hartford economy and the end of the cigar boom combined to cause the reduction in the plaintiff's gross sales from 1998 through 2000, not the management policies implemented by the defendant in the face of substantial annual operating deficits.

The plaintiff also cannot prevail on its claim that those policies, which were predicated in large part on the defendant's decision to keep the Civic Center open until a buyer could be secured rather than to close the Civic Center and to buy out existing leases, necessarily demonstrated that the defendant's conduct was motivated by bad faith. On the contrary, the defendant was free to take appropriate action to reduce the losses it had incurred for many years, and the evidence fully supported the trial court's conclusion that the ameliorative measures that the defendant had taken were reasonably designed to achieve that end. The defendant, moreover, had no obligation to buy out the plaintiff's lease or even to relieve the plaintiff of its responsibilities under the lease.[11] Nor was the defendant otherwise

---

[11] As the trial court noted, the plaintiff's lease, unlike the leases of other tenants, contained no provision linking the plaintiff's obligations under the lease either to a particular occupancy rate or to a key tenant remaining at the Civic Center.

obliged to ensure the plaintiff's fiscal well-being. In sum, the record does not support the plaintiff's contention that the trial court was clearly erroneous in finding that the defendant's actions were motivated not by some improper purpose or scheme but, rather, by a legitimate interest in curtailing its losses.[12]

For all of the foregoing reasons, we conclude that the trial court properly found that the management policies that the defendant had implemented after it had decided to sell the Civic Center did not violate the lease's implied covenant of good faith and fair dealing. In light of the court's findings regarding the propriety of those policies, the plaintiff's claim that the defendant violated the lease's implied covenant of good faith and fair dealing by rejecting the plaintiff's option to renew its lease also is without merit; because the defendant was not responsible either for the plaintiff's failure to pay rent or for its failure to attain gross annual revenue of at least $262,500, the defendant was entitled, under the express provisions of the lease, to decline the renewal of the lease for those reasons.

We turn, finally, to the plaintiff's CUTPA claim. With respect to that claim, the trial court determined that, "[a]t the most, [the] plaintiff has shown that [the defendant], in an attempt to extricate itself from an unprofitable business venture, reduced its promotion of the Civic Center and changed its leasing policies in order to facilitate a sale of the Civic Center. That hardly constitutes unfair, immoral or unscrupulous conduct. . . .

---

[12] In support of its claim of bad faith, the plaintiff offered the testimony of George Garrity, the former general manager of the Civic Center mall, who stated that, because the occupancy rate of the mall was crucial to its long-term success, he considered it his responsibility to maintain a high occupancy rate. This testimony, however, does not undermine the trial court's conclusion that the defendant's failure to achieve a high occupancy rate was not the result of bad faith but, rather, a virtually inevitable consequence of economic factors—most significantly the downturn of the Hartford economy—beyond the defendant's control.

"Thus, the court concludes [that] the plaintiff has failed to establish that [the defendant] engaged in any acts that were unlawful, that offended public policy as established by statutes or common law, or [that] were immoral, oppressive or unscrupulous." (Citation omitted.)

In rejecting the plaintiff's claim that the defendant had breached the implied covenant of good faith and fair dealing, we concluded that the evidence supported the trial court's findings that the defendant acted in good faith toward the plaintiff and that the weak Hartford economy and the end of the cigar boom, rather than any conduct of the defendant, caused the plaintiff's economic woes. The very same evidence upon which those findings were predicated also provides the basis for the court's determination that the defendant did not engage in any conduct prohibited by CUTPA. We therefore reject the plaintiff's CUTPA claim as well.

The judgment is affirmed.

In this opinion the other justices concurred.