******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WEBSTER BANK, N.A. *v.* GFI
GROTON, LLC, ET AL.
(AC 35575)

Sheldon, Mullins and Schaller, Js.

*Argued Janaury 20—officially released May 26, 2015*

(Appeal from Superior Court, judicial district of New London, Hon. Joseph Q. Koletsky, judge trial referee.)

*Jeffery O. McDonald*, with whom, on the brief, was *Louis N. George*, for the appellants (named defendant et al.).

*George A. Dagon*, *Jr.*, with whom was *Eric B. Miller*, for the appellee (plaintiff).

*Opinion*

MULLINS, J. In this breach of contract action, the defendants, GFI Groton, LLC (developer), Steven E. Goodman, John DeLiso, GFI Investments V Groton, LLC, and CAT Developers, LLC, appeal from the judgment of the trial court, rendered after a bench trial, in favor of the plaintiff, Webster Bank, N.A. (bank). The defendants claim that the court improperly (1) determined that the bank had complied with its funding obligations under an agreement to finance a building project and (2) concluded that the bank had made reasonable efforts to mitigate its damages. We affirm the judgment of the trial court.

The following facts, which the court reasonably could have found, and procedural history are relevant to our resolution of this appeal. The developer undertook a project to acquire land and develop a condominium and townhouse complex in Groton (project). The project entailed constructing and selling the units of three condominium buildings on a parcel of land (property). The three buildings, respectively, would consist of twelve, sixteen and sixteen condominium units. On or about September 27, 2004, the developer entered into an agreement with the bank to finance the project.

Under the terms of the parties' agreement, the bank agreed to fund the project in the form of two loans: (1) an acquisition and development loan totaling $2,044,500; and (2) a revolving loan totaling $1,600,000 (loans). The acquisition and development loan would be used to purchase the property and perform site work outside of the building construction. The revolving loan would be used to fund the construction of the condominium units. The loans were made pursuant to corresponding loan agreements that set forth the obligations of the developer and the bank with respect to each loan. Additionally, the loans were secured by respective promissory notes executed by the developer (notes), as well as four "Payment and Completion Guaranty Agreements" (guaranties) that separately were executed by Goodman, DeLiso, GFI Investments V Groton, LLC, and CAT Developers, LLC (guarantors). The developer also executed a mortgage on the property in favor of the bank.[1]

The notes provided that the developer would initially pay only the monthly interest on the loans. The revolving loan agreement specified an "absorption rate" at which the developer was required to construct and sell a specified number of units every year.[2] Pursuant to the acquisition and development loan agreement, the developer was to repay the bank $44,450 of that loan upon the sale of each condominium unit and the bank, in turn, was to issue a release of a corresponding portion of the mortgage.

The revolving loan agreement provided a procedure

by which the developer was to draw funds for the project as construction progressed. To receive disbursements from the revolving loan, the developer was required to submit to the bank its construction costs, which, in turn, would determine the amount of funding to which the developer was entitled. Specifically, to receive funding under terms of the revolving loan agreement, the developer was required to submit to the bank a letter "requesting the amount of the particular disbursement" along with various supporting documents. Section 4.02 (a) of the revolving loan agreement provided that the developer was permitted to draw up to 90 percent "of the actual vertical hard and soft costs of construction," but not more than $117,000 per condominium unit.[3]

During the construction of the first building, the developer submitted construction costs to the bank of $85,000 per unit. Pursuant to the terms of the revolving loan agreement, the bank disbursed to the developer $76,500 per unit, which was 90 percent of the developer's submitted construction costs. By May, 2006, the developer had completed construction on the first building, and sold its twelve units. The developer repaid the bank pursuant to the loan agreements for each unit sold in the first building.

In 2005, the developer commenced construction on the second building and increased the construction costs that it submitted to the bank to $113,750 per unit. As a result, the bank disbursed to the developer $102,375 per unit, or 90 percent of its budgeted cost.

In August, 2006, when construction on the second building was underway, the developer and the bank agreed to modify the revolving loan agreement and note because of concerns that the developer was not complying with its required absorption rate. The parties entered into a loan modification agreement and amended the revolving loan agreement (2006 agreement). Under the 2006 agreement, the parties agreed to increase the principal balance of the revolving loan from $1,600,000 to $2,250,000. The 2006 agreement also eliminated the revolving loan's maximum draw restriction of $117,000 per unit. Nonetheless, under the 2006 agreement, the developer still was obligated to submit draw requests to the bank to receive funds, and still was only entitled to draw up to 90 percent "of the actual vertical hard and soft construction costs of each unit . . . ."

After the parties executed the 2006 agreement, the developer continued to submit draw requests for the second building based on construction costs of $113,750 per unit; the bank continued to disburse to the developer $102,375 per unit. When the developer started to construct the third building, it again submitted to the bank construction costs of $113,750 per unit for that building. The bank, thus, continued to disburse funds

to the developer for the third building at the rate 90 percent of the submitted construction costs, or $102,375 per unit.

As the September 30, 2007 maturity date on the notes approached, the developer was performing the framing work on the third building. On September 23, 2007, the developer submitted to the bank a draw request from the revolving loan in the amount of $62,400 for labor to install drywall.[4] The bank fully funded that request. After the notes matured, however, the developer was not permitted under the loan agreements to draw funds until the bank agreed to new maturity dates on the loans.

On November 30, 2007, the bank and the developer executed a second modification agreement (2007 agreement), pursuant to which the maturity date of the acquisition and development loan was extended until September 30, 2009, and the maturity date on the revolving loan was extended until September 30, 2010. In conjunction with the 2007 agreement, the guarantors executed a "Reaffirmation of Guaranty, Consent and Waiver" (reaffirmation). Under the terms of the 2007 agreement and reaffirmation, the parties waived all claims and defenses arising prior to November 30, 2007.

The parties agreed that additional funding would be available to the developer under the 2007 agreement after the developer completed the work for which the bank already had disbursed funds. As a result, the developer recognized that the bank would not fund additional draw requests until after the developer completed the drywall installation.

After receiving the September, 2007 disbursement from the bank for drywall labor, however, the developer never completed installing the drywall in the third building. A representative from the bank visited the third building on a regular basis to monitor progress, and observed that the drywall never was installed.

Additionally, the bank received no further draw requests from the developer. In its oral ruling, the court stated: "The court does not have enough evidence to make a specific finding, but . . . the clear inference that the court draws [is] that no draw request was made because no draw request would have been honored since the work for which the developers had already been paid had not been done."

The developer completed construction on the second building and sold all sixteen of its units. For each of the first fifteen units sold in the second building, the developer repaid the bank $44,450 toward the principal balance on the acquisition and development loan. When the final unit of the second building was sold in April, 2008, however, the bank relinquished its right to receive the final $44,450 payment in order to provide the developer more liquidity. Nonetheless, that same month, the

developer ceased making interest payments to the bank on the loans.

On June 5, 2008, the bank notified the defendants by certified letter that the loans were in default. Afterward, the parties entered into negotiations to save the project. The defendants made proposals to the bank, under which the bank would advance additional funds to the developer for construction. The bank rejected these proposals.

In January, 2009, the developer sent documents to the bank that indicated that the developer owed its subcontractors hundreds of thousands of dollars for unpaid work, as a result of which it was facing numerous lawsuits. After receiving this notification, the bank informed the defendants, by way of a second default letter dated March 17, 2009, that the notes were in default and that it was exercising its right to accelerate payment. After the bank sent the second default letter, the defendants made several offers to the bank to purchase the notes for amounts less than the total debt owed. The bank refused those offers. The developer never completed the third building.

On July 21, 2009, the town of Groton (town) filed an action against the developer seeking, inter alia, to foreclose tax liens on the property for unpaid property taxes. On August 24, 2009, the bank filed the present action, in which it initially sought to foreclose its mortgage "in case the town was not working in a timely fashion." The town's tax lien had a higher priority than the bank's mortgage; the bank, thus, was named as a subsequent encumbrancer in the town's foreclosure action.

In October, 2010, the bank's subsidiary, Birch Bark Properties, Inc., purchased the property for $750,000 through a tax foreclosure sale. After the sale, the bank considered the remaining principal on the acquisition and development loan satisfied and forgave a portion of the revolving loan principal. Nonetheless, the revolving loan still had an outstanding principal balance, and the interest on both loans remained unpaid.

Thereafter, the bank amended its complaint to assert that the defendants had breached the terms and conditions of the notes and guaranties. The defendants filed a revised answer denying many of the bank's claims against them, asserting multiple special defenses, and filing their own counterclaims against the bank.[5]

On March 27, 2013, after a seven day trial, the court, *Hon. Joseph Q. Koletsky*, judge trial referee, rendered judgment in favor of the bank on all of its breach of contract and guaranty claims, and rejected the defendants' counterclaims. The court awarded to the bank the outstanding principal on the revolving loan, unpaid interest on both loans, reimbursement for property taxes, and attorneys' fees and costs. This appeal fol-

lowed.[6] Additional facts and procedural history will be set forth as necessary.

On appeal, the defendants challenge the propriety of the trial court's adverse factual findings. Specifically, the defendants maintain that the court improperly (1) determined that the bank complied with its funding obligations required by the loan agreements and (2) concluded that the bank adequately had mitigated its damages. We are not persuaded.

We begin by setting forth the relevant law and applicable standard of review. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Hawley Avenue Associates, LLC* v. *Robert D. Russo, M.D. & Associates Radiology, P.C.*, 130 Conn. App. 823, 832, 25 A.3d 707 (2011). "Whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review." *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 431 n.5, 849 A.2d 382 (2004). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 849, 817 A.2d 683 (2003).

I

The defendants claim that the court improperly concluded that the bank complied with its funding obligations under the loan agreements. The defendants specifically argue that the bank failed to provide them sufficient funding to install the drywall in the third building because the developer's actual construction costs were higher than the funding that the bank disbursed to it. The defendants contend that the bank "misinterpreted the maximum amounts allowable under the loan documents," and argue that "[h]ad the trial court properly determined that the [developer] [was] entitled to funding of at least $117,000 per unit, there would have been adequate funding available to complete the sheetrock." We are not persuaded.

In its oral ruling, the court stated that "[t]here is no doubt that when the loan matured in September of 2007, the loan was indeed turned off, but that loan was turned back on in November or early December of 2007 [pursuant to the 2007 agreement], and funds were available when work [that] had already been paid for by the bank was completed so that additional funds would be forthcoming." The court further determined that, despite the bank having provided funding to install dry-

wall in the third building, the developer never completed its installation. According to the court, after the 2007 agreement was implemented, there was "a clear inference . . . that no draw request was made because no draw request would have been honored since the work for which the developers had already been paid had not been done." The record supports the court's conclusions.[7]

Here, the language of the revolving loan agreement provided that the funding to which the developer was entitled was to be determined by the construction costs that the developer submitted to the bank. The 2006 agreement, which was operative when the developer made its September 23, 2007 draw request in the amount of $62,400 for drywall installation, removed the revolving loan's funding maximum of $117,000 per unit, but still provided that the "[the bank] will advance [to the developer] . . . 90 percent of the actual vertical hard and soft construction costs, of each unit . . . ." Even so, the 2006 agreement did not alter the requirement that "[r]equests for disbursements *shall be submitted by* [*the developer*] on forms satisfactory to [the bank] . . . ." (Emphasis added.) Indeed, to disburse funding to the developer, the bank still required "[a] letter from [the developer] requesting the amount of the particular disbursement . . . ."

The record reflects that, after the 2006 agreement went into effect, the developer never increased the construction costs that it submitted to the bank. The evidence in the record demonstrates that, during construction on the third building, the developer submitted to the bank construction costs in the amount of $113,750 per unit, which was the same level of funding that the developer had requested for the second building, prior to the 2006 amendment. Thus, notwithstanding the parties' agreement to remove the $117,000 maximum funding limit, the bank had no reason or basis to fund the developer's construction costs in excess of the amount the developer actually requested. Accordingly, because the developer continued to submit requests for construction costs in the amount of $113,750 per unit, the bank fulfilled those requests by disbursing to the developer funding at the rate of $102,375 per unit, which was 90 percent of the developer's submitted construction costs.

With respect to drywall installation in the third building specifically, the developer submitted to the bank costs of $6000 per unit.[8] As a result, the bank was required to disburse $5400 per unit, which was 90 percent of the developer's $6000 submitted cost. At the time the developer made the September, 2007 disbursement request, however, the developer already had received draws in the amount of $1500 per unit for drywall installation. Thus, the developer requested and received the remaining $3900 per unit, or a total of $62,400, for dry-

wall installation for the sixteen units in the third building.

The record thus demonstrates that the bank complied with its contractual obligations by fulfilling the developer's requests for funding based on the construction costs that the developer submitted. As a result, the bank never breached any of its obligations to fund properly submitted draw requests for the developer's construction costs.

Despite the bank's financial disbursement in compliance with the construction costs submitted by the developer, the defendants argue that the bank nonetheless should have been aware that the developer's actual construction costs were higher than what was reflected in its construction budget. Specifically, the defendants contend that, because the 2006 agreement provided that the developer was entitled to "90 percent of the *actual* vertical hard and soft construction costs," the bank breached the terms of the revolving loan by not advancing to the developer further sums, in addition to the costs the developer submitted, to cover the actual construction costs. (Emphasis added.) Thus, the defendants argue that, because the court should have found that the bank failed to advance to it further sums, the developer's failure to continue making interest payments did not constitute a breach of the loan documents. To support this argument, the defendants rely on the principle that "a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract." (Emphasis omitted; internal quotation marks omitted.) *Shah* v. *Cover-It, Inc.*, 86 Conn. App. 71, 75, 859 A.2d 959 (2004). This claim borders on the frivolous.

First, and most significantly, the insuperable obstacle for the defendants is the language of the loan documents. In particular, the loan documents provided that the amount of funding to which the developer was entitled was to be determined by the construction costs that the developer submitted to the bank. Therefore, the bank was obligated to fund the construction costs based on only the submission of such costs by the developer. There is no dispute that this is precisely what the bank did. There is no provision in the loan documents, nor any other sound legal basis, for requiring the bank to fund construction costs that were not properly submitted to it.

Second, and relatedly, the record demonstrates that the developer never once increased the construction costs that it submitted to the bank for the third building, despite its ability to do so.[9] Thus, even if additional funds were available for the drywall installation, the developer never submitted a draw request to obtain those additional funds. It is beyond our comprehension to understand how the bank was supposed to divine the developer's actual construction costs and advance

to it additional funds without the developer submitting those costs. Absent any request for additional funds, the bank clearly did not breach any contract. Consequently, the evidence in the record supports the court's finding that the bank complied with its contractual obligations by disbursing funds to the developer at the rate of $102,375 per unit for the third building, which was 90 percent of the construction costs submitted by the developer.

## II

The defendants also claim that the court improperly concluded that the bank made reasonable efforts to mitigate its damages following the default on the notes. Specifically, the defendants argue that the court should have found that the bank failed to mitigate its damages because (1) it "refused to provide additional funding to complete the units, which would have resulted in sales proceeds," and (2) "it refused to convey the note for a reasonable sum." The defendants' claim has no merit.

We begin by setting forth the standard of review. "We have often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages. . . . What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier. . . . Furthermore, we have concluded that the breaching party bears the burden of proving that the nonbreaching party has failed to mitigate damages. . . . The defendant thus bears the burden of proving that the plaintiff failed to make reasonable efforts to mitigate the amount of damages." (Citation omitted; internal quotation marks omitted.) *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 145, 907 A.2d 1220 (2006).

"To claim successfully that the plaintiff failed to mitigate damages, the defendant must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty." (Internal quotation marks omitted.) *Preston* v. *Keith*, 217 Conn. 12, 22, 584 A.2d 439 (1991). Nevertheless, "[t]he duty to mitigate damages does not require a party to sacrifice a substantial right of his own in order to minimize a loss." *Camp* v. *Cohn*, 151 Conn. 623, 627, 201 A.2d 187 (1964).

The following additional facts, which the court reasonably could have found, and procedural history are relevant to this claim. In the summer of 2008, after the loans were in default, the defendants and the bank entered into negotiations to save the project. The defendants made an offer to the bank under which the bank would loan them an additional $583,000 that they would use to complete construction on the third building. As

part of this offer, the defendants additionally promised that, within three months of receiving funding from the bank, they would repay the sum of $791,000. The bank refused that offer.

In 2009, after the bank sent the second default letter, the defendants made four separate offers to the bank to purchase the notes for sums ranging from $1,000,000 to $1,250,000. The bank also refused those offers. Indeed, at the time of trial, the bank represented that the payoff of the outstanding balance on the loans was nearly $2,000,000 in principal, interest and late charges, in addition to more than $100,000 for its payment of property taxes to the town.

In its oral decision, the court stated that "[t]he failure of the bank to take less than fifty cents on the dollar was hardly . . . a violation of any covenant of fair dealing . . . ." The defendants then brought the present appeal, and filed a motion for articulation on the ground that "the [trial] court's . . . order was unclear as to whether the court considered the defendants' claim that the [bank] did not adequately mitigate its damages."

The trial court issued an articulation, in which it stated the following: "The defendants argued [at trial] that among the myriad defalcations [they] claimed . . . the bank to have been guilty of, the foreclosing bank failed to mitigate damages. Largely, this was a claim that by not continuing to fund the defendants' troubled project by infusing additional monies, the bank caused the project to fail, thus increasing damages. Basically, the defendants' claim was that if additional funding had been provided the project would have been successful so there would have been no damages. The defendants also claimed that by not accepting settlement offers made by the defendants, the bank suffered larger damages than would have been the case had the . . . bank taken what the court referred to in its original decision as less than 50 cents on the dollar. Unfortunately for the defendants' position, the evidence . . . does not justify such a conclusion. As the court thought it had said in its decision, there was no failure to mitigate damages by the [bank]." The record supports the conclusions of the court.

First, the defendants claim that the bank's refusal to provide the developer with additional funds after the notes were in default constituted a failure on the part of the bank to mitigate its damages. We disagree.

Under the defendants' proposal, the bank would have been required to expend more than $500,000 on what the court characterized as "the defendants' troubled project." Indeed, by the time that the proposal was made, the developer already had defaulted on the notes and was facing multiple pending lawsuits as the result of failing to pay its subcontractors. The defendants' mere promise to repay the bank hardly guaranteed that

the bank would minimize its losses. See 16 Restatement (Second), Contracts § 350, comment (g), p. 132 (1981) (it is not "reasonable to expect [nonbreaching party] to take steps to avoid loss if those steps may cause other serious loss"); see also 22 Am. Jur. 2d 345, Damages § 368 (2013) ("[a] party to a contract who is not in breach need not make substantial expenditures to avoid damages from breach because compelling an innocent party to spend money to mitigate damages might entail risks beyond those assumed in the contract" [footnote omitted]).

Second, the defendants claim that the court should have found that the bank failed to mitigate its damages because the bank did not accept their offers to purchase the notes. We are not persuaded.

After the bank sent to the defendants the second default letter, the defendants made four offers to buy the note for sums ranging from $1,000,000 to $1,250,000. The record supports the court's finding, however, that the value of the notes far exceeded those offers. Indeed, the court awarded to the bank more than $2,000,000 in principal, interest, attorney's fees and taxes arising from the defendants' default. Thus, as the court noted, the defendants did not demonstrate that the bank failed to mitigate damages by not accepting "less than 50 cents on the dollar."

The defendants' claim ignores the fact that the developer defaulted on the notes in April, 2008. At that point, the bank had the legal right to accelerate payment on the notes and collect on the developer's outstanding debt. Additionally, the guarantors all had executed guaranties, whereby they had made absolute promises to pay the outstanding debt on the notes upon the developer's default. Therefore, once the notes went into default, the bank was authorized to collect on the debt by bringing the present action, and it was under no obligation to forgo its right to recover its losses by selling the notes at a discount.

Our Supreme Court has long abided by the principle that "[t]he duty of the plaintiff to keep the damages from the breach of the contract as low as reasonably possible does not require of it that it disregard its own interests or exalt above them those of the defaulting defendants. . . . [The plaintiff is] not under an obligation to sacrifice any substantial right of its own in order to minimize the loss of the defendants." (Citation omitted.) *Raff Co.* v. *Murphy*, 110 Conn. 234, 243, 147 A. 709 (1929). The evidence in the record supports the court's conclusion that the bank's refusal of the defendants' offers to buy the notes did not constitute a failure to mitigate its damages. The bank had the legal right to collect on the defaulted notes, and it was not under any obligation to accept any of the defendants' offers for settlement.

In sum, the defendants have not met their burden to prove that the bank failed to mitigate damages. After a careful review of the record, we conclude that the evidence before the court demonstrated that the bank's conduct was reasonable under the circumstances, and, thus, that the court's factual findings were not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In this opinion, the loan agreements, notes, guaranties and mortgage are referred to collectively as the "loan documents."

[2] The terms of the revolving loan agreement required the developer to "maintain a minimum unit absorption rate of (i) 12 units in year one (ii) 24 units in year two and (iii) 25 units in year three."

[3] Section 4.02 (a) of the revolving loan agreement provided in relevant part: "The maximum amount [the developer] shall be entitled to draw down on the [p]rincipal [a]mount with respect to each unit shall not exceed the lesser of (i) ninety (90%) percent of the actual vertical hard and soft costs of construction, including interest but not to include marketing . . . [or] (iv) [o]ne [h]undred [s]eventeen [t]housand and 00/100 [d]ollars ($117,000.00) per unit."

[4] The terms "drywall," "Sheetrock," and "rock" were used interchangeably at trial.

[5] The defendants asserted as special defenses: unclean hands; payment; fraud; waiver; estoppel; laches; breach of the implied covenant of good faith and fair dealing; and frustration of purpose. The defendants filed the following counterclaims: breach of contract; breach of the implied covenant of good faith and fair dealing; breach of fiduciary duty; promissory estoppel; violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.; fraudulent misrepresentation; negligent misrepresentation; and tortious interference with a business relationship. The defendants do not raise any issues on appeal regarding the court's rejection of its special defenses or counterclaims.

[6] During the pendency of this appeal, in response to the defendants' motion for articulation filed with this court, the trial court clarified that it had concluded that the bank adequately had mitigated its damages.

[7] The defendants do not challenge the court's implicit conclusion that, after the bank had paid for the drywall installation and the 2007 agreement was implemented, the developer never submitted another draw request. Indeed, at oral argument before this court, the defendants' counsel conceded that, after the developer's September, 2007 request for drywall labor costs had been submitted, the developer made no further draw requests of the bank.

[8] In its draw requests, the developer submitted to the bank itemized construction costs, which specified the costs of constructing different elements of the condominium units. Then, pursuant to the terms of the revolving loan agreement, the bank disbursed to the developer 90 percent of the itemized costs.

[9] Indeed, the developer increased the construction costs that it submitted to the bank from $85,000 per unit for the first building to $113,750 for the second building. The developer, thus, was aware that, to receive increased funding from the revolving loan, it could increase the construction costs that it submitted to the bank, and had already done so.